643 So.2d 1236 (1994)
Jaqueline Dore LEYVA
v.
IBERIA GENERAL HOSPITAL, et al.
No. 94-C-0795.
Supreme Court of Louisiana.
October 17, 1994.
Rehearing Denied November 17, 1994.[*]
*1237 R. Ray Orrill, Jr., Robert F. Shearman, Leslie A. Cordell, Gay Lyn McDaniel Curlin, Orrill, Shearman & Cordell, for applicant.
Daniel L. Regard, for respondent.
CALOGERO, Chief Justice.[**]
Plaintiff's medical malpractice case against the physician who performed on her a bilateral tubal ligation alleges that because of the physician's negligence during the first surgical procedure, she needlessly underwent subsequent surgeries. The jury trial resulted in a verdict and judgment in favor of the defendant.
We granted Plaintiff's writ application because it appeared that the district court and the court of appeal had erroneously applied the law when barring the testimony by plaintiff's expert witness, Dr. Jack Pruitt, causing material injustice. Supreme Court Rule 10, Section 1.(a)4 (West 1994).
We now conclude that the courts below erred in excluding the testimony of Dr. Pruitt, an ob/gyn specialist whose proffered testimony indicates that he would have testified regarding the nationally applicable standard of care for performing the Parkland Procedure, the surgical procedure that plaintiff underwent.
Plaintiff, Jaqueline Dore Leyva, is a deaf-mute. Mrs. Leyva also has retinosa pigmentosa which has caused her eyesight to deteriorate. Chiefly, because of her physical condition, she chose to become sterile by having a lateral tubal litigation after the birth of her second child.
It was at Iberia General Hospital in New Iberia, Louisiana, on February 23, 1986, that she gave birth to a healthy son. Immediately after delivery, Dr. G.D. Sagrera performed the bilateral tubal litigation. As a part of the procedure Dr. Sagrera was to remove a small part of each fallopian tube in order to verify, in part at least, that the operation had been performed properly. During the procedure, the segments removed were labelled "left" and "right" fallopian tube and placed in separate containers. The containers were subsequently transferred by the circulating nurse to a pathology collection counter. On Monday, February 24, 1986, the tissue samples were transferred to the Pathology Department for analysis.
Dr. Emil Laga, a pathologist, examined the specimens. He testified that he was unable to identify the sample labelled "left fallopian tube" as part of a fallopian tube. Dr. Laga's supervisor, Dr. J.B. Pecot, also examined the specimens, and he too was unable to find any fallopian tube tissue in the left side specimen. After learning of the pathology findings, Dr. Sagrera told Ms. Nellian Dore, Ms. Leyva's mother. Ms. Dore than informed her daughter, Mrs. Leyva, of the dilemma.
Dr. Sagrera testified that he discussed several alternative solutions with Ms. Dore and felt certain that Ms. Dore would communicate these options to her daughter: 1) do nothing further (Dr. Sagrera explained that he was confident that the left tube had been properly ligated); 2) undergo a second procedure during which he would check the condition of the left tube and ligate it, if that had not already been properly done; and 3) perform a hysterosalpingogram to determine whether or not the tubes were in fact properly closed, or, per chance, still open. Mrs. Leyva's testimony was that she "understood that he forgot the left side ... and that [she] would have to have another surgery."
About six weeks later, on April 4, 1986, a second surgical procedure was performed called a laparotomyin order to learn whether the left tube had been properly ligated during the first procedure, and should it be found that it had not been, to ligate the tube during this second procedure. Dr. Sagrera testified that in this second operation, he examined both tubes and concluded that they had been properly ligated in the first operation. Dr. Sagrera said that because the uterus and the fallopian tubes had reduced in size following the first operation, he was then able to obtain a clear view of the *1238 ligated tubes. Additionally, Dr. Sagrera testified that the scrub nurse, the circulating nurse and the nurse anesthetist pointedly observed the fallopian tubes during the second procedure and verified that they already had been properly ligated. No verification sample tissues were taken during this second procedure. Dr. Sagrera concluded that it was unnecessary to take such samples, and he wanted to avoid causing the patient any additional pain. Plaintiff urges that the failure to obtain samples in this second procedure was a breach of the acceptable standard for performing this exploratory procedure.
Thereafter, Mrs. Leyva underwent a third surgical procedure, an appendectomy. In a fourth operation, she had a cyst removed from an ovary. She filed this medical malpractice claim to recover damages arising from the second, third and fourth procedures. She asserts that the negligence which occurred in the first tubal ligation resulted in her having to undergo the subsequent surgeries. The complaint was filed against Iberia General Hospital, and Drs. Laga, Pecot and Sagrera. Prior to trial, Mrs. Leyva settled her claims against the hospital. After the presentation of Plaintiff's case, the trial judge granted a directed verdict in favor of Drs. Laga and Pecot. The case against Dr. Sagrera went to the jury.
At the trial Plaintiff called Dr. Jack Pruitt, an obstetrician/gynecologist practicing in Lake Jackson, Texas. Dr. Pruitt was tendered as an expert in obstetrics, including obstetrical surgery. Counsel for Dr. Sagrera objected on the grounds that Dr. Pruitt did not practice medicine in a locale similar to New Iberia, Louisiana, and that Dr. Pruitt is a specialist in obstetrics while Dr. Sagrera is only a general practitioner. After hearing arguments from both sides, outside the presence of the jury, the court barred Dr. Pruitt's testimony for the reason that Dr. Pruitt did not practice in a neighboring or similar community to New Iberia, Louisiana. This excluded testimony was nonetheless proffered. Later, without the benefit of Plaintiff's expert's testimony, the jury found Dr. Sagrera not negligent in his treatment of Mrs. Leyva.
On appeal, a Third Circuit panel, with one judge dissenting, affirmed the jury's finding. 634 So.2d 1297. The dissenting judge believed that the trial court erred in excluding the testimony of Plaintiff's expert witness.
The state of the law prior to 1975 was discussed by this Court in Meyer v. St. Paul-Mercury Indemnity Co., 73 So.2d 781 (La. 1953). In Meyer, we held that a physician, surgeon, or dentist had a duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence in the application of his skill.
In 1975, the Legislature passed Acts 1975, No. 807, § 1, ultimately designated as Louisiana Revised Statute 9:2794. This statute codified the holding in Meyer insofar as general practitioners were concerned. It also created for medical specialists a "uniform" standard of care based on standards existing within the specialty pursuant to national standards. In Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331, 1340 (La.1978), this Court recognized the effect of the statute and held
that a medical specialist is required by Louisiana Civil Code Articles 2315 and 2316, and Louisiana Revised Statute 9:2794, to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised and possessed by physicians within his medical specialty ...
Ardoin thus provided two standards: specialists were subject to a common standard to be discerned from within their specialty; general practitioners were only held to the standards prevailing within the community in which they practiced.
The test for general practitioners was legislatively altered in 1979, by an amendment to Louisiana Revised Statute 9:2794. This act substituted the phrase "in a similar community or locale and under similar circumstances" for the antecedent language which expressly limited the appropriate standard of care to that of general practitioners in the same community.
The legislative changes were recognized by this Court in Sam v. XYZ Insurance Co. et al., 489 So.2d 907 (La.1986). In Sam a per curiam decision by this Court, we held that a *1239 doctor need not practice in the same community in order to be qualified to testify as an expert regarding the applicable standard of care. Rather, it is sufficient that the doctor practices in a "similar neighboring community." (Louisiana Revised Statute § 9:2794: "in a malpractice action based on the negligence of a non-specialist physician, the plaintiff has the burden of proving, among other elements, ... the degree of care ordinarily exercised by physicians ... in a similar community or locale and under similar circumstances").
There have been no substantive changes in the law since 1979. This Court, however, has addressed its application in several opinions. In one such case, McLean v. Hunter, 495 So.2d 1298 (La.1986), we held that the testimony of a specialist with knowledge of the requisite subject matter was qualified to testify regarding the standard of care in a general practitioner's locale. This Court stated that a specialist was "no less a dentist because he engages in a specialty practice rather than a general dentistry practice" Id. at 1302.
The trial judge here, relying on Sam, found that Dr. Pruitt was not shown to have practiced in, or come from a similar or neighboring community (and, indeed, plaintiff did not attempt to present evidence which would have established the affinity between the two locales), and thus barred the testimony of Dr. Pruitt. Were this the controlling consideration, the trial judge's ruling would not be incorrect.
This case, however, presents a discrete circumstance as to which the controlling jurisprudence is Piazza v. Behrman Chiropractic Clinic, Inc., 601 So.2d 1378 (La.1992). We held in Piazza, that where there is a uniform nationwide method for performing a particular medical procedure, an expert having knowledge of such method is qualified to testify, and that the testifying expert in this circumstance is not constrained by the need to have practiced in a similar community or locale and under similar circumstances. Id.
This case is governed by the foregoing principle. Dr. Sagrera's tubal ligation consisted of performing the "Parkland Procedure." This is a bilateral tubal ligation, a surgical procedure in which the patient is placed under general anesthesia and the physician enters the patient's abdomen and locates her fallopian tubes. The physician then takes a section out of each tube and ties the ends. After the tubes are cut, the egg is no longer able to travel from the ova and become fertilized. During the procedure, it is standard to remove a small section of each tube in order to verify that the appropriate organ has been subjected to the surgery.
Dr. Pruitt's proffered testimony evidences that he was familiar with the Parkland Procedure performed here. In fact, he stated that he had performed 500-600 of these procedures at the time of the trial. Dr. Pruitt also referred to the Parkland Procedure as a "modified Pomeroy" and stated that it is performed according to a common method regardless of where the procedure is done.
Also, the defendant himself, Dr. Sagrera, testified that he had no specific knowledge that the Parkland Procedure was performed according to a different technique elsewhere in the United States. When asked whether he had "ever hear[d] or read it's done differently anywhere else in the United States in 1986," Dr. Sagrera replied that he had not. It was also the testimony of both doctors that they participated in continuing medical education, and kept abreast of changes in the field.
Further, the testimony established that the Parkland Procedure was taught both doctors in medical school pursuant to the Williams Obstetrics textbook. In fact, Dr. Sagrera was presented with a Williams Obstetrics textbook at trial, and after reviewing a printed description of the Parkland Procedure, he stated that the text accurately described it.
Dr. Pruitt testified that he learned to perform the Parkland Procedure in medical school, and that he had performed 500-600 such procedures by 1986. By his testimony regarding his education, training, and experience, Dr. Pruitt established that he had knowledge of this procedure. He, therefore, should have been permitted to testify concerning it.
*1240 It is of no significance that Dr. Sagrera was not a specialist. He was accustomed to performing the procedure and did so on the plaintiff, the same Parkland Procedure (tubal ligation) that Dr. Pruitt had performed very frequently, a procedure which each had been taught in medical school, one governed by a common nationwide standard. Thus, we hold that the trial court erred in barring the testimony.
Because Dr. Pruitt's testimony, essential to plaintiff's case, was erroneously barred by the trial judge, the jury's pro-defense verdict is entitled to no deference. The court of appeal should therefore decide the case on the record without having to find first that the district court's judgement was clearly wrong. Gonzales v. Xerox, 320 So.2d 163 (La.1975).

DECREE
Accordingly, we remand this case to the court of appeal for their independent review of the record, including the proffered testimony of Dr. Pruitt, and to decide the merits of plaintiff's appeal.
REVERSED; REMANDED TO THE COURT OF APPEAL.
NOTES
[*] Justice Johnson participated in the decision on rehearing rather than Justice Williams.
[**] Judge Felicia Toney Williams, Court of Appeal, Second Circuit, participated as Associate Justice Pro Tempore (effective September 1, 1994). Judge William Norris, III, Court of Appeal, Second Circuit, sitting by assignment in place of Justice James L. Dennis in cases argued on September 6-8 and 12, 1994, was the judge not on panel for this case. See Rule IV, Part 2, § 3.