655 So.2d 560 (1995)
Jess ROWSEY, Jr., Plaintiff/Appellee/Appellant,
v.
Dr. Henry JONES, et al., Defendants/Appellants/Appellees.
No. 26823-CA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1995.
*564 Bruscato, Tramontana & Underwood by Anthony J. Bruscato, Crawford & Anzelmo by Donald J. Anzelmo, Monroe, for appellant.
Hudson, Potts & Bernstein by Jesse D. McDonald, Hayes, Harkey, Smith & Cascio by Bruce M. Mintz, Theus, Grisham, Davis & Leigh by Ronald L. Davis, Jr., Monroe, for appellee.
Before NORRIS, WILLIAMS and STEWART, JJ.
NORRIS, Judge.
This is a medical malpractice suit. The plaintiff is Jess Rowsey, Jr., son of Mrs. Lula Rowsey, who was diagnosed and treated for terminal squamous cell lung cancer but died three years later from a heart attack; an autopsy revealed no sign of cancer. Defendants were her family physician, Dr. Henry Jones; the oncologist, Dr. Marshall Leary; the pathologists, Drs. Richard Blanchard and James Geisler; Pathology Associates, Inc. and St. Francis Medical Center. Before suit was filed in district court, Mr. and Mrs. Rowsey filed a complaint requesting a medical review panel pursuant to La.R.S. 40:1299.47. The panel determined that the evidence did not support a conclusion that the defendant physicians failed to meet the applicable standard of care. Unfortunately, both Mr. and Mrs. Rowsey died while the matter was pending; after the panel rendered its decision, Jess Rowsey, Jr. timely filed a petition in district court, seeking damages on his parents' behalf as well as his own. The trial court dismissed St. Francis from the suit on a directed verdict. The jury rendered a verdict in favor of Jess Rowsey, Jr. and against Dr. Jones, but absolved the other defendants. Judgment for plaintiff was entered accordingly. Jess Rowsey, Jr. and Dr. Jones, along with the Patients' Compensation Fund (PCF) which intervened after final judgment was rendered, now appeal. For the following reasons, we amend and affirm the judgment as amended.

Facts
Lula Rowsey began seeing Dr. Jones in early 1982. He treated her for diabetes and followed her through brain surgery for two berry aneurysms. The problems relative to this litigation started in February of 1986. On February 13, an emaciated Mrs. Rowsey presented to Dr. Jones complaining of weakness, congestion, coughing and difficulty breathing. A physical exam revealed rhonchi throughout her lungs. Dr. Jones's office records document Mrs. Rowsey's history as a heavy smoker and diabetic; his impression was that she had diabetes mellitus, influenza, and possibly pneumonia. Mrs. Rowsey was admitted to St. Francis Medical Center that same day. A chest x-ray revealed multiple soft tissue masses and nodular densities throughout both lung fields, which compared with x-rays taken in 1982 and 1985, had increased in number. The radiologist reported that their presence for this length of time would mitigate somewhat against metastatic disease, but suggested that it be considered in the differential diagnosis.
Dr. Jones sought the help of Dr. Antti Maran, a pulmonary specialist; he saw Mrs. Rowsey on February 15. Dr. Maran also concluded that the nodules had changed in character and increased in size since 1982; he noted some of the nodules were calcified, but others were not (calcified nodules are almost always benign). His impression and differential diagnosis read: "Perplexing. Certainly, the possibility of metastatic carcinoma needs to be considered but the presence without a major change in four years is somewhat mitigating against cancer as a diagnosis." He noted many other less serious conditions that needed to be considered as well. Dr. Maran recommended a fiberoptic bronchoscopy; by this procedure he could get cells by either brushing a lesion with a small brush attached to the bronchoscope or washing a section of the lung with a dilute salt water solution, and possibly tissue by clipping a piece from the lesion. The next day, Dr. Maran performed the bronchoscopy and a transbronchial needle aspiration; he obtained cells but no tissue from the lower lobe of the right lung, and sent the specimens *565 to St. Francis's Pathology Department for cytologic interpretation.[1]
On February 17, Drs. Blanchard and Geisler interpreted the slides and found abnormal cells which looked like cancer cells on both brushing slides and one of the six washing slides; they reported both the brushing and washing smears as positive for malignant cells, morphologically suggestive of squamous cell carcinoma of the lung. The aspirate smears were negative. Based on the cytology report, Dr. Maran charted that the bronchoscopy results implied carcinoma, probably squamous cell. Based on the bronchoscopy, he felt that the cancer had not originated in the lung, and suggested also considering the bladder, lung, head, ears, eyes, nose and throat as a "primary" location. At this point, he felt they had a "working diagnosis" of cancer. He did not recommend obtaining a tissue sample at this time.
Also on February 17, a CT scan of the chest showed multiple nodules, some containing calcium. Dr. Golson, the radiologist, suggested they may be granulomas, but could not be sure that one or two were not metastatic lesions because not all of the nodules contained calcium. He noted that clinical information might help the interpretation considerably.
According to Dr. Jones, the positive cytology meant Lula Rowsey had cancer; he told Lula and her husband the bad news. The experts at trial agreed that a person with metastatic squamous cell lung cancer could not be cured and would have about one year to live. In accord with Mr. Rowsey's wishes, Dr. Jones consulted a cancer specialist, Dr. Leary.
Dr. Leary examined Mrs. Rowsey the next day; he agreed with the diagnosis of cancer because she looked very sick (coughing, weight loss, etc.), the chest x-ray showed nodules that could be consistent with cancer, and the cytology report was positive. Dr. Leary documented that this was a "tough case"; the cytology showed questionable squamous cell; he would start investigating for a primary and question the results. Also on this date, Dr. Maran signed off the case because he felt he was not offering any service; he instructed them to call back if he could be of any help. Despite examinations by Dr. Armstrong, an OB/GYN specialist, and Dr. Stassi, an ENT specialist, no primary was found. This occurs, according to Dr. Leary, in about 10 out of 100 cases of cancer. At this point, Dr. Leary felt it appropriate to treat Mrs. Rowsey for cancer.
Dr. Leary recommended chemotherapy as primarily palliative therapy; it might control the disease and "buy some extra months to years," but could offer no cure. Mrs. Rowsey agreed. Dr. Leary explained that most squamous cell cancers originate, statistically, in the head and neck area; so he chose a relatively non-toxic chemotherapeutic agent, Methotrexate, because it is the best drug for slowing the growth of this type of cancer. Mrs. Rowsey, described as a somewhat difficult patient, refused to receive chemotherapy at Dr. Leary's office; she took the first set of treatments as an outpatient at St. Francis through March. In order to continue chemotherapy, she was to return to Dr. Leary's office for a physical exam, lab work, and a reevaluation; she never did. When Dr. Jones learned of this, he testified he pleaded with Mrs. Rowsey and finally convinced her to let him administer the chemotherapy. Dr. Jones changed the agent to Flourouracil ("5-FU"), an even less toxic one in the same family, but admitted he did not consult Dr. Leary or any other oncologist; he was familiar with this agent and had used it in treating patients for cancer before there were oncologists in the Monroe area. Dr. Jones gave her the treatments through mid-May, but stopped when she began experiencing stomach *566 irritation; he had promised her she would not suffer any side-effects.
On June 3, 1986 Dr. Jones took a chest x-ray at his office. He interpreted the lesions in the lungs as compatible with carcinoma. Although he testified that he saw no change from the February x-ray, he admitted that his office records do not reflect that he ever made such a comparison. In fact, his office notes never mention the progress of her cancer. In August of 1987, one year and two months later, Dr. Jones took another chest x-ray. Again, no mention is made of any comparison with previous x-rays. According to Dr. Jones, the x-rays were not taken to monitor any change in the nodules, but simply to assess the overall condition of her lungs.
On April 28, 1988, Mrs. Rowsey was admitted to St. Francis by Dr. Owen Meyers, who was practicing at that time with Dr. Jones, for weakness thought to be due to low blood sugar. A chest x-ray was taken on April 29; Dr. Barraza, the radiologist, noted that the changes in the lung fields could be due to a mycotic infection such as histoplasmosis, but could not exclude the possibility of metastatic carcinoma. Mrs. Rowsey was discharged the same day.
During an office visit with Dr. Jones on June 6, Mrs. Rowsey complained of chest pain and coughing. Dr. Jones testified that because the recent x-ray was still suspicious for metastatic disease and two years had passed since that diagnosis, he wanted to consult with a pulmonary specialist about her condition. His office records note that she was to see Dr. Lee Roy Joyner on June 23. Dr. Jones testified at trial that she did not keep the appointment, although his notes do not reflect this.
On October 25, 1988, Mrs. Rowsey appeared in the emergency room at St. Francis complaining of weakness, headache and dizziness. She was admitted and stayed in the hospital until October 28. During her stay, a chest CT scan was done; it showed scattered soft tissue pulmonary densities consistent with hematogenous spread of metastasis. Dr. Golson did a chest x-ray and found multiple pulmonary and mediastinal nodules that had not changed since April 1988. He opined that the nodules were not metastatic but secondary to granulomatous disease. Dr. Jones testified that at this point in time, he still felt she had cancer, and was simply doing remarkably well. In addition, her EKG showed T-wave abnormalities; Dr. Jones felt these changes were non-specific and of no clinical significance.
On January 3, 1989, Mrs. Rowsey was admitted to St. Francis by Dr. Jones for high fever, rigors and possible pneumonia. In his notes, Dr. Jones reported that Mrs. Rowsey had all the stigmata of metastatic carcinoma to the lungs, but this diagnosis has never been made definitively. At trial, he explained that he was referring to the fact they had never found a primary; in other words, there was only doubt as to the type of cancer she had.
During her hospitalization Dr. Jones contacted Dr. Joyner to assess the condition of her lungs. Another chest x-ray taken on January 4 reported multiple pulmonary nodules, some of which were clearly calcified, suggesting granulomatous disease (possibly inactive) rather than metastasis; there had been no definite change compared with the study of October 1988. Dr. Joyner saw Mrs. Rowsey on January 5. First, he was surprised she was still alive; the average life span for squamous cell carcinoma is one year maximum and he had never heard of a case where a patient was cured by chemotherapy. Second, he compared her 1986 x-ray with the present one, found no change in the nodules for over three years since the positive cytology, and concluded that the test was probably a very rare false positive. His final impression was that the multiple pulmonary nodules represented histoplasmosis. Dr. Joyner testified at trial that in his opinion the nodules in 1989 were not malignant nor were they malignant at any time in the past; the initial diagnosis in 1986 was wrong. In spite of this, Dr. Jones testified at trial that he thought Dr. Joyner meant she never had cancer "in those nodules," but she still had cancer. R. p. 921.
Nevertheless, three years after she was diagnosed with terminal lung cancer, Mrs. Rowsey and her husband were told that she *567 did not, in fact, have cancer. In addition, an EKG taken on January 3, showed that Mrs. Rowsey had suffered a heart attack fairly recently, but Dr. Jones never informed her of this. He decided not to tell her the bad news because she "had enough on her mind." R. p. 926. He also did not document her heart attack in either the hospital discharge summary or his office records because he felt that the EKG itself was sufficient. Mrs. Rowsey was discharged on January 9. She last saw Dr. Jones for an office visit on January 11.
Thereafter, Mrs. Rowsey sought treatment from another family practitioner, Dr. Owen Meyers, who had since left Dr. Jones's practice. Mrs. Rowsey indicated on the new patient form that she had no heart problems. Dr. Meyers testified that his standard office procedure was to request all medical records from the patient's previous physician; Dr. Meyers never received Mrs. Rowsey's records from Dr. Jones. Only Dr. Jones knew about Mrs. Rowsey's heart attack and he never contacted Dr. Meyers. In mid-May, Mrs. Rowsey began to complain of heart palpitations. Tests showed she had an elevated blood sugar level and slightly low potassium level. An EKG revealed a sinus tachycardia, not surprising to Dr. Meyers considering she had been under a great deal of stress. He prescribed medication to slow her heart rate; two days later it had returned to normal. Dr. Meyers referred her to a cardiologist, Dr. Emile Barrow. Dr. Barrow recommended tests and correction of her potassium deficit; the deficit tends to cause the heart to generate extra beats. Mrs. Rowsey did not have the scheduled halter monitor and echocardiogram, however, because of financial problems. By the second visit approximately one week later, her condition had improved. According to Dr. Meyers, in late July she was still complaining of heart palpitations, but he felt, and Dr. Barrow agreed, that they were pursuing the proper course of treatment. Dr. Meyers testified that had he known she had suffered a heart attack, it would have raised his index of suspicion that her symptoms were actually related to a cardiac problem; he would have then conveyed this information to Dr. Barrow. On referral by Dr. Joyner, Mrs. Rowsey saw another cardiologist, Dr. David Burkett, on September 13. At this time, she was still complaining of heart palpitations. The physical exam was unremarkable. He asked her to return with her medical records, but she never did.
On the night of December 3, 1989, Mr. Rowsey discovered his wife unconscious, lying on the floor in their home. She was rushed to the hospital where unsuccessful attempts were made to resuscitate her; she died that same evening. On December 5, Drs. Stephen Blanchard and Jerry Liles performed an autopsy; despite a thorough and careful study, they found no sign of cancer. They listed the final cause of death to be either an arrhythmia or an acute myocardial infarction (heart attack). The pulmonary nodules were finally classified as very rare amyloid deposits, which can only be determined by studying tissue. Both Dr. Blanchard and Dr. Liles testified that she probably did not have cancer.

Trial & Jury's Findings
The evidence presented at trial focused on two distinct claims, one alleging negligent diagnosis, treatment, and monitoring of Mrs. Rowsey's cancer condition, and the other alleging a failure to properly diagnose and treat her heart condition. The trial spanned two weeks, and numerous medical experts testified. On the cancer issue, plaintiff's experts were Dr. Lee Roy Joyner, Dr. John Friedman, Dr. Mitchell Friedman, all experts in pulmonary and internal medicine, and Dr. Robert Bucklin, an expert in anatomical, forensic and clinical pathology. Dr. Jones's expert was Dr. Sol Courtman, a family practitioner; Dr. Leary's experts were Dr. Alan Grosbach, member of the review panel and expert in the fields of internal medicine, oncology and hematology, and Dr. Antti Maran, expert in pulmonary and internal medicine; finally, testifying for Drs. Blanchard and Geisler was Dr. Warren Grafton, an expert in pathology. On the heart attack issue, plaintiff's expert was Dr. Robin Lake, an expert in cardiology and internal medicine; and for Dr. Jones, Dr. Sol Courtman. The substance of their testimony will be discussed at length *568 below in connection with the parties' assignments of error.
The jury rendered a verdict from special interrogatories in favor of Jess Rowsey, Jr. and against Dr. Jones on both claims, finding that he breached the standard of care in rendering medical care to Mrs. Rowsey. The jury awarded:

Cancer claim
Medical expenses $ 11,583
Mrs. Rowsey
pain/suffering $ 75,000
Mr. Rowsey $100,000
Heart attack claim
Mr. Rowsey $ 45,000
Jess Rowsey, Jr. $ 40,000

Jess Rowsey, Jr. and Dr. Jones and PCF have appealed various aspects of the jury's findings as well as some of the trial court's rulings on procedural issues. On appeal, Dr. Jones and PCF urge seven assignments of error; Jess Rowsey, Jr. has assigned four. We will first review the parties' assignments regarding the jury's finding of liability as to each defendant, then the trial court's rulings, and finally the damage awards.

Applicable Law-Burden of Proof and Standard of Review
In a medical malpractice action against a family or general practitioner, the plaintiff must prove by a preponderance of the evidence:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances ...
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La.R.S. 9:2794 A.
A physician is not held to a standard of absolute precision; rather his conduct and judgment is evaluated in terms of reasonableness under then-existing circumstances, not on the basis of hindsight or in light of subsequent events. Iseah v. E.A. Conway Memorial Hosp., 591 So.2d 767 (La.App.2d Cir.1991), writ denied, 595 So.2d 657 (1992); Broadway v. St. Paul Ins. Co., 582 So.2d 1368 (La.App.2d Cir.1991).
Resolution of the above criteria as well as assessing the conflicting testimony of expert witnesses are factual determinations which lie squarely within the purview of the trier of fact. Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991); Roland v. Tedesco, 616 So.2d 780 (La.App.2d Cir.), writ denied, 619 So.2d 579 (1993). Such evaluations are subject to great deference and will be disturbed on review only if manifestly erroneous or clearly wrong. Stobart v. State, Through Dept. of Transp., 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The mere choosing by the jury of one expert's view over another does not in and of itself constitute reversible error. Neumeyer v. Terral, 478 So.2d 1281 (La.App. 5th Cir.1985), writ denied, 481 So.2d 631 (1986). Moreover, it is the duty of a reviewing court to consider the evidence in its entirety, not merely that portion of the record which will support or undermine the judgment. Elliott v. Robinson, 612 So.2d 996 (La.App.2d Cir.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed where conflict exists in the testimony. Stobart, supra; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).

Medical Care Rendered For Cancer
By their first assignment, Jones and PCF contend that the jury erred in finding that Dr. Jones's actions were below the acceptable standard of care, and that his negligence was a cause of Mr. and Mrs. Rowsey's damage. Jess Rowsey, Jr. seeks affirmance of the jury verdict as to Dr. Jones and urges in his first two assignments of error that Drs. Leary, Blanchard and Geisler breached their duty of care, and should be held liable as well.
*569 The duty of care extended to all phases, diagnosing, treating, and the follow-up or monitoring of the cancer. Dr. Jones, as Mrs. Rowsey's treating physician, was predictably involved in all three components. Dr. Leary took part in the diagnosis and treatment, but was discharged by Mrs. Rowsey less than two months after the diagnosis. Dr. Blanchard's and Dr. Geisler's role was even more limited; they participated solely in diagnosing Mrs. Rowsey's cancer. With this in mind, we address whether each physician properly discharged his particular duty.

I. The pathologistsDr. Blanchard and Dr. Geisler
Plaintiff contends that the pathologists breached the standard of care first, by interpreting the slides wrong, and second, by failing to consult with either Dr. Jones or Dr. Maran about Mrs. Rowsey's clinical situation (all other information such as x-rays, CT scans, physical data, etc. gathered by the clinician).
Resolution of these issues truly hinges on the outcome of the battle between the pathology experts, Dr. Bucklin for the plaintiff and Dr. Grafton for the defendants. (Defendants, Blanchard and Geisler, were also accepted as experts by the court.) The defendants contend their expert, as a professor of pathology at LSUS and director of Anatomic Pathology for LSUS's affiliated hospital where he interprets about 400 cytology slides a week, is more credible than Dr. Bucklin, who has not worked in a hospital setting for 28 years and interprets only 60 cytology slides a year.
The pathologists essentially agreed on the criteria or standard to follow in interpreting cells; the crucial feature is the nucleus. Dr. Grafton explained that benign cells have three characteristics, roundness, uniformity and predictability; malignant cells lose these. Likewise, Dr. Bucklin testified that malignant cells usually vary in size and shape, and the nuclear membrane has indentations or irregularities. Nevertheless, the pathologists diverged in applying the above criteria; Dr. Bucklin saw none of these characteristics in the cells whereas Dr. Grafton identified all of the characteristics of malignancy.
Dr. Bucklin was of the opinion that the pathologists misinterpreted the washing and brushing slides. He testified that there were no malignant cells on any of the slides; the cells appeared abnormal, but they were merely "reactive" due to inflammation. According to Dr. Bucklin, it would be below the standard of care to find that the cells were malignant. Dr. Grafton interpreted the slides as positive for malignancy, suspicious of large cell undifferentiated carcinoma.[2] Though his interpretation differed slightly from Drs. Blanchard and Geisler's, he testified, "There is no doubt in my mind that they followed the appropriate standard of care and they interpreted these slides correctly." R. p. 1211. The jury's credibility determinations are entitled to great weight; on this record, we cannot say that the jury was clearly wrong to believe Drs. Grafton, Blanchard and Geisler over Dr. Bucklin.
Likewise, plaintiff's assertion in brief that the pathologists breached the standard of care by failing to confer with the other treating physicians, is based solely on Dr. Bucklin's testimony.[3] Dr. Grafton, Dr. Blanchard and Dr. Geisler all testified that as pathologists, it is their job to interpret the smears; clinical information was neither necessary nor would it have changed their opinion as to whether the cells on the slides looked malignant. Dr. Blanchard testified in deposition that even if there had been a proven diagnosis of inflammatory reaction, he would have reported that the cells were morphologically suggestive of squamous malignant cells. R. p. 997. Dr. Grafton testified that it is up *570 to the treating physician to decide whether the clinical picture is compatible with the cytologic interpretation. It was within the jury's prerogative to believe the defendants and their expert and conclude that the pathologists in the instant case did not breach the acceptable standard of care. We find no manifest error.[4]

II. The oncologistDr. Leary
Jess Rowsey, Jr. contends that Dr. Leary breached the standard of care in diagnosing Mrs. Rowsey with cancer and also in instituting chemotherapy treatment upon such diagnosis. Dr. Leary suggests that he did not technically diagnose the cancer; Rowsey sought treatment from him only after she had been diagnosed with cancer. However, as is plain from the record, Dr. Leary examined Mrs. Rowsey, reviewed all the evidence, and clearly concurred in the diagnosis of cancer. In any event, we conclude the jury was not plainly wrong to find that Dr. Leary rendered appropriate medical care, both in diagnosing and treating Mrs. Rowsey.
The record evidence shows that two crucial pieces of information existed upon which to make a diagnosis in the instant case: Mrs. Rowsey's "clinical picture" (which consisted of the 1986 chest x-ray and any physical signs consistent with cancer) and the positive cytology report. Every expert agreed that it is within the acceptable standard of care to diagnose a patient with cancer when these two things are consistent. If the two conflict, meaning the clinical picture is inconsistent with cancer, plaintiff's experts in pulmonary and internal medicine agreed that further diagnostic tests are necessary; tissue must be obtained in order to make a "definitive diagnosis." The pathologists, Dr. Blanchard, Dr. Geisler, and Dr. Grafton all noted that cytology, which is 97 percent accurate, has well-known limitations; histology, referred to as the "gold standard," is more precise. The testimony sharply conflicted, however, with regard to whether the clinical picture was, in fact, inconsistent with the pathology report.
It is essentially undisputed that Mrs. Rowsey's physical appearance in February 1986 was consistent with someone who had cancer; thus, the controversy focused on the chest x-ray. Both the radiologist and Dr. Maran noted that the length of time the nodules had been present mitigated against cancer, but also felt it was certainly a possibility. Dr. Jones, Dr. Leary, Dr. Maran, and Dr. Grosbach all felt that the patient's x-ray was consistent with cancer; the nodules had changed since her previous x-ray; new ones were present, some were enlarged, and not all contained calcium. Thus according to Dr. Maran, the x-ray was not completely stable even though some of the nodules had been there for a long time. On the other hand, plaintiff's pulmonary experts found the x-ray inconsistent with the positive cytology. Based on the evidence, however, the jury could have reasonably believed that both the chest x-ray and cytology report were consistent with cancer and formed a sufficient basis for such a diagnosis; thus, Dr. Leary met the applicable standard of care in diagnosing or concurring in the diagnosis of cancer. We are not at liberty to overturn the jury's findings in this regard simply because the record contains some evidence to support plaintiff's view. Neumeyer v. Terral, 478 So.2d at 1290. The jury's finding is not plainly wrong.
As for the treatment of cancer, plaintiff contends that Dr. Leary fell below the standard of care in initiating chemotherapy on the sole basis of the positive cytology; he argues that no definitive diagnosis existed upon which to start treatment.
Expert testimony at trial established that in order to start treating for cancer, the clinical picture must be consistent with the positive cytology; to initiate chemotherapy based on conflicting information would be below the standard of care. Nevertheless, as previously stated, the jury found that the physicians complied with the standard of care in diagnosing Mrs. Rowsey with cancer; *571 the doctors felt, and the jury apparently accepted, that her clinical picture was consistent with the positive cytology. Therefore, because there was a proper diagnosis of cancer, Dr. Leary did not breach the established standard of care in rendering treatment to Mrs. Rowsey for that condition.
Rowsey also argues that Dr. Leary breached the standard of care by failing to confer with the pathologists before administering chemotherapy. Dr. Leary testified that the physicians must use their clinical judgment to decide whether to start chemotherapy; in this case, Mrs. Rowsey's physical condition and the chest x-ray, with evidence of a definite change in the nodules, was consistent with the positive cytology; and it is the clinician, not the pathologist, who is in the best situation to consider all the information, reach this decision, and determine the appropriate course of treatment. There is no record evidence to support plaintiff's assertion that the standard of care required Dr. Leary to consult the pathologists before initiating chemotherapy. In sum, the jury was not plainly wrong to conclude that Dr. Leary did not breach the standard of care in rendering medical care to Mrs. Rowsey.

III. The family practitionerDr. Jones
Plaintiff argues that Dr. Jones breached the standard of care by failing to obtain tissue and diagnosing cancer based solely on a positive cytology, administering chemotherapy to Mrs. Rowsey without consulting an oncologist, and failing to properly monitor her condition and timely correct the cancer diagnosis. Dr. Jones and PCF point to the jury verdict, absolving Dr. Leary, as evidence that the jury believed both the diagnosis and initial treatment of cancer to be correct, but must have found fault with the treatment rendered by Dr. Jones subsequent to Dr. Leary's discharge; this finding, they contend, is clearly wrong. Although we agree with the inference gleaned from the jury's exonerating Dr. Leary, we find that the record will support the jury's verdict; Dr. Jones breached the established standard of care for monitoring Mrs. Rowsey's cancer, and consequently failed to timely reevaluate and correct the improper diagnosis.
We note that Dr. Jones administered chemotherapy after Dr. Leary was discharged; he not only changed the chemotherapeutic agent but also admitted that he did not consult with Dr. Leary or any other oncologist during the course of her treatment. Such action, however, cannot form the basis for the jury's verdict. Even were we to agree that Dr. Jones breached the established standard of care, we are constrained to find plaintiff has not proved that Dr. Jones's actions under the circumstances caused any harm to Mrs. Rowsey. La.R.S. 9:2794 A; also see Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La. 10/17/94), 643 So.2d 1228. Based on the information available to the physicians at that time, the diagnosis of cancer was proper and chemotherapy was the only available course of treatment. There is no evidence that Dr. Jones administered the treatments improperly other than the fact that he changed the type of agent. Dr. Mitchell Friedman testified that the 5-FU did not appear to have caused any physical damage to Mrs. Rowsey. R. p. 1339. The evidence also showed that the agent Dr. Jones selected was in the same family of agents and was milder and less toxic than the one used by Dr. Leary. The requisite causation link was simply not established.
Regarding follow-up, Mrs. Rowsey's chemotherapy treatments ended in May 1986 and Dr. Jones remained her treating physician until January 1989. Drs. Mitchell Friedman, Leary and Grosbach, who on this record were obviously familiar with the standard of care for a general practitioner in Monroe, testified to the proper standard of care for monitoring a cancer patient. All agreed that after six months had passed with no change in the nodules and no physical deterioration, they would have reevaluated and rethought the diagnosis; a patient with incurable squamous cell lung cancer is only expected to live six months to a year. They also agreed that proper assessment would require repeat chest x-rays to compare the nodules' growth or shrinkage to previous x-rays; Dr. Leary testified these should be taken every two months. Dr. Friedman testified that the follow-up treatment rendered *572 by Dr. Jones was clearly below the standard of care. R. p. 1375. Significantly, Dr. Jones provided no expert witness testimony at trial to controvert plaintiff's experts.
During the two and a half year period following the last chemotherapy treatment, Dr. Jones admitted that he took only two chest x-rays, the first in June, four months after she was diagnosed with cancer, and the second, over one year later in August 1987. The only other x-rays were taken during hospitalizations in April and October 1988 and January 1989. Dr. Jones acknowledged that his office records did not reflect that he ever compared previous x-rays. Moreover, his office records do not document the progress of her cancer; it appears that the diagnosis was not questioned or reassessed until January 1989, almost three years after she had been diagnosed with terminal lung cancer. Dr. Jones testified that he believed she had cancer and was considering additional chemotherapy in June 1988, that he may have told her husband in October 1988 that she was "close to the end," and that even as of January 1989, he believed she had cancer, just not in the lungs. R. pp. 917, 919, 921.
On appeal, Dr. Jones and PCF contend that the jury committed manifest error because there was simply no expert medical testimony upon which it could base a decision that his follow-up care of Mrs. Rowsey fell below the standard of care. To the contrary, we find that the record supports the jury's verdict; there is no evidence, other than Dr. Jones's own self-serving testimony, to advance his argument that he met the applicable standard of care. Based on the evidence adduced at trial, it appears that the diagnosis of cancer could have been corrected at the six month mark, as early as August 1986. The jury did not commit manifest error in reaching the conclusion that the treatment rendered Lula Rowsey by Dr. Jones fell below the standard of care, and that this breach caused damage to Mr. and Mrs. Rowsey.

Medical Care Rendered For Heart Condition
By their second assignment, Dr. Jones and PCF contend the jury was clearly wrong to find that Dr. Jones's medical care for Lula Rowsey's heart condition fell below the standard of care. They urge on appeal that even if Mrs. Rowsey died of a heart attack there is no causal relationship between her death and Dr. Jones's failure to diagnose and treat her for a heart condition in January 1989. Rowsey argues that there was sufficient record evidence to prove that Dr. Jones breached the standard of care and that this breach lessened his mother's chance of survival.
Clearly, the law requires that Rowsey establish a causal connection between Dr. Jones's negligence and Mrs. Rowsey's death; he must prove that she had a "chance of survival," which was lost as a result of Dr. Jones's negligence. Pfiffner, supra; Smith v. State, through DHHR, 523 So.2d 815, 820 (La.1988). A substantial factor in lessening the chance of survival need not be the only causative factor; it need only increase the risk of harm. Smith v. State of Louisiana, DHH, 26,280 (La.App. 2d Cir. 12/9/94), 647 So.2d 653, and citations therein, writ granted.
On this record, we agree that the plaintiff proved a breach of the standard of care by Dr. Jones. Plaintiff's expert in cardiology, Dr. Lake, possessed the requisite knowledge as to the standard of care for a general practitioner in Monroe; he testified that the results of the EKG in January 1989 required, at the very least, further investigation by Dr. Jones, or a consultation with a cardiologist. Dr. Jones's failure to do either, according to Dr. Lake, was "totally unacceptable." R. p. 1262. Dr. Courtman, defendant's expert in family medicine, disagreed however with regard to the proper steps to be taken after the January 1989 EKG. He testified that because she was not suffering from any cardiac symptoms, the standard of care did not require any specific treatment or consulting a cardiologist at that time; Dr. Jones should have followed her closely until she developed symptoms.
Dr. Lake also testified that the heart attack was "critical information" for the physicians who treated her after she left Dr. Jones. R. p. 1267. However, Dr. Jones neither mentioned the heart attack to Mrs. Rowsey nor charted it in her medical records. *573 Dr. Lake testified this was below the acceptable standard of care. Dr. Jones's own expert, Dr. Courtman, testified that the standard of care would require a physician to inform his patient about the heart attack. Dr. Meyers, who treated Mrs. Rowsey after Dr. Jones, testified that had he known about the heart attack, he would have attributed her palpitations and chest pain to a potentially serious heart problem rather than some other condition. R. p. 1070.
On the causation issue, Dr. Lake testified that an evaluation in early January would have likely shown that she was a good candidate for angioplasty; however, without treatment her chances of more heart damage increased. He concluded that if proper treatment had been instituted timely, her risk of another heart attack or death would have been "decreased markedly." R. p. 1268. The plaintiff's expert evidence does not quantify in percentages, Mrs. Rowsey's chance of survival, as the evidence did in Smith v. State, supra. However, the record unmistakably shows that she had a substantial chance of survival. This chance was significantly decreased due to Dr. Jones's failure to treat Mrs. Rowsey after the infarction. More importantly, Dr. Jones offered no testimony to contradict this.
Based on the evidence, the jury could have concluded that Dr. Jones should have acted upon the abnormal EKG and either investigated the situation himself or consulted a cardiologist; had he done so, Mrs. Rowsey's heart problem more probably than not could have been treated and corrected. In addition, Dr. Jones failed to mention or chart the heart attack, effectively preventing anyone else from acting on the information as well. We reject defendants' assertion in brief that there was no record evidence as to the type of measures Dr. Jones should have taken and whether those measures would have provided Mrs. Rowsey a chance of survival. See Arant v. St. Francis Medical Center, 605 So.2d 622, 629 (La.App.2d Cir.), writ denied, 608 So.2d 193 (1992). Moreover, the only record evidence on the causation issue was provided by plaintiff and establishes that Dr. Jones's failure to take preventative measures after he learned of Mrs. Rowsey's heart attack was a substantial factor in causing her subsequent death from an arrhythmia or heart attack. On this record, plaintiff has shown that Dr. Jones's negligence was a substantial factor in destroying his mother's chance of survival. Smith v. State through DHHR, supra; Hastings v. Baton Rouge Gen'l Hosp., 498 So.2d 713 (La.1986). Because the record discloses no manifest error, we will defer to the jury's findings.

Locality Rule
By their third assignment, Dr. Jones and PCF contend that the trial court erred in allowing plaintiff's expert, Dr. John Friedman, a pulmonary specialist from Phoenix, Arizona, to testify about the standard of care applicable to Dr. Jones, a general practitioner in Monroe, Louisiana. At trial, Dr. Jones objected to this witness testifying because he had never practiced or attended medical school in Louisiana. R. p. 701. Plaintiff responded that because Dr. Jones held himself out as a specialist in oncology, he should be judged according to the national standard applicable to specialists. The trial court overruled the objection, finding it went to the weight of the evidence rather than the admissibility.
The "locality rule," which now applies solely to nonspecialists, requires that the degree of care to which the physician is to be held is based upon the standard of practice in a similar community or locale and under similar circumstances. La.R.S. 9:2794 A(1) (emphasis added). Specialists are held to a national standard, that degree of care ordinarily practiced by physicians within the involved medical specialty. Because Dr. Jones has neither limited his practice to the specialized field of oncology, nor held himself out as a specialist in treating cancer patients, the locality rule rather than a national standard applies. See Iseah, 591 So.2d at 772; Parmelee v. Kline, 579 So.2d 1008 (La.App. 5th Cir.), writ denied, 586 So.2d 564 (1991).
Revised Statute 9:2794, as interpreted by the Supreme Court, requires that an expert possess the requisite knowledge about the applicable standard of care. A specialist may testify as an expert witness in a case involving a general practitioner if he has *574 sufficient knowledge of the requisite subject matter. McLean v. Hunter, 495 So.2d 1298, 1302 (La.1986). However, the expert must also be familiar with the standard required of a physician under similar circumstances and in a similar community. See Sam v. XYZ Ins. Co., 489 So.2d 907 (La.1986). Though the "locality rule" has not been legislatively altered since 1979, the Supreme Court has carved out a jurisprudential exception eliminating even the "similar community" requirement where a uniform nationwide method for a particular medical procedure has been established. Piazza v. Behrman Chiropractic Clinic, 601 So.2d 1378 (La.1992); Leyva v. Iberia General Hosp., 94-0795 (La. 10/17/94), 643 So.2d 1236, 1239.
Piazza involved a malpractice action against a chiropractor. The Supreme Court reversed the intermediate court's ruling, and allowed an out of state chiropractic expert, who was not actively practicing and had never practiced in Louisiana or a similar locale, to testify regarding the standard of care in Houma. The testimony at trial established that there was a uniform standard of training and practice for chiropractic physicians, common to all chiropractors regardless of the community or locale in which they practiced. Thus, it was acceptable for the district court to have concluded that the expert was qualified based on his experience in the field of chiropractic medicine.
Similarly in Leyva, the Supreme Court reversed the lower courts, allowing into evidence the testimony of an expert in obstetrics from Texas regarding the standard of care applicable to a general practitioner from New Iberia, Louisiana, charged with malpractice in performing a tubal ligation. The evidence established that the "Parkland Procedure" he used was governed by a common nationwide standard. The expert was thus qualified to testify based on his proven knowledge of that procedure.
Although the same may be true in the instant case, we are constrained by the record, which is devoid of any evidence to suggest that there is a uniform nationwide procedure for diagnosing and treating cancer patients. Outside of this discrete circumstance, an expert must be familiar with the degree of care ordinarily exercised by physicians in a similar community or locale and under similar circumstances. La.R.S. 9:2794. Although Dr. Friedman was clearly very knowledgeable in the field of lung cancer, he was actively practicing in Phoenix at the time of trial, and had never practiced in Monroe or attended medical school in Louisiana. There was no evidence introduced to establish the affinity between the two locales. On this record, we must conclude that the trial court erred in allowing Dr. Friedman to testify. Nevertheless, the error was harmless.
There is sufficient evidence, without the testimony of Dr. Friedman, to support the jury's verdict; this testimony did not prejudice Dr. Jones. See Chamberlain v. State, Through DOTD, 621 So.2d 1118, 1123 (La. App. 1st Cir.1993). Two other pulmonary specialists, Dr. Joyner and Dr. Mitchell Friedman, as well as Dr. Grosbach and Dr. Leary, testified favorably to the plaintiff on the lung cancer issue; and a cardiologist, Dr. Lake, provided the essential testimony regarding the heart attack. The record supports that these experts had practiced in either the same or similar locales, and possessed the requisite knowledge to testify regarding the standard of care for a family physician practicing in Monroe, Louisiana. Both Dr. Joyner and Dr. Leary practice in Monroe, Dr. Grosbach has practiced in Shreveport since 1982, Dr. Mitchell Friedman is currently a professor of medicine and chief of pulmonary and critical care medicine at Tulane University in New Orleans, and finally, Dr. Lake practiced for eight years in Monroe. The testimony of these witnesses established that Dr. Jones's treatment fell below the standard of care for a general practitioner in Monroe. We find no reversible error.

Jury Charge
Dr. Jones and PCF's fifth assignment, related to the above, is that the trial court erred in using plaintiff's Special Jury Instruction No. 10, which read:
In a medical negligence case, it is a specialist's knowledge of the requisite subject matter, rather than the specialty or sub-specialty within which the specialist practices, *575 which determines whether a specialist may testify as to the degree of care which should be exercised by general practitioners. A particular specialist's knowledge of the subject matter on which he is to offer expert testimony should be determined on a case by case basis. McLean v. Hunter, supra.
Dr. Jones timely lodged an objection to the instruction at trial; it was overruled. On appeal, they contend that the instruction was improper; it amounted to a comment by the court on the evidence and was tantamount to the court's suggesting that Dr. Friedman was qualified to testify about the standard of care for a general practitioner in Monroe. We disagree.
The court is not obligated to give the precise instructions submitted by the parties, but those given must correctly reflect the relevant issues and law. La.C.C.P. art. 1793; Scheidt v. Denney, 93-2014 (La. App. 1st Cir. 10/7/94), 644 So.2d 813, 815; Doyle v. Picadilly Cafeterias, 576 So.2d 1143, 1152 (La.App. 3rd Cir.1991). The adequacy of jury instructions must be determined on the basis of the instructions as a whole. Doyle, supra. On review an appellate court must exercise great restraint, and set aside the verdict only in cases where the instructions misled the jury to such an extent as to prevent it from doing justice. Creel v. S.A. Tarver & Son Tractor Co., Inc., 537 So.2d 752 (La.App. 1st Cir.1988); Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5th Cir.), writ denied, 434 So.2d 1097 (1983).
The trial court correctly instructed the jury that general practitioners must exercise that degree of care ordinarily exercised by physicians licensed to practice in Louisiana and actively practicing in a similar community under similar circumstances, but that specialists must adhere to the standard of care within the specialty itself, regardless of locality. The McLean instruction does not alter the locality rule for general practitioners; it simply recognizes that in some instances a specialist may also possess knowledge of and be qualified to testify regarding the standard of care for a general practitioner.
The trial court also instructed the jury that it should consider each expert opinion and give it such weight and sufficiency as the jury believed the opinion deserved. Jury Instruction No. 10 was not a comment on the weight to be given Dr. Friedman's testimony; this was left exclusively to the jury. The jury was free to disregard the opinion in its entirety if it believed that Dr. Friedman was not familiar with the standard of care which should be exercised by a general practitioner licensed to practice and actively practicing in Monroe. The jury instruction did not mislead the jury and certainly did not cause injustice or prejudicial error to result. The trial court did not err in reading plaintiff's McLean jury instruction.
Dr. Jones and PCF also assert that the trial court erred in failing to include in the charge Dr. Jones's requested language from Smith v. State, through the Dept. of Health and Human Resources, 523 So.2d 815 (La.1988), and Tabor v. Doctors Memorial Hosp., 563 So.2d 233 (La.1990) on the issue of causation. These cases discussed the plaintiff's burden of proving that the patient had a chance of survival and that the defendant's conduct was a substantial factor in causing the harm. Dr. Jones made a timely objection at trial, which was overruled.
The court charged the jury as follows:
In a medical malpractice action the plaintiff need not show that the defendant's conduct was the only cause of the harm, nor must he negate all other possibilities, rather he must show by a preponderance of the evidence, that he suffered the injury because of the defendant's conduct.
* * * * * *
To establish causation in a situation where a patient dies, the plaintiff must prove only that the physician's malpractice resulted in the patient's loss of a chance of survival, rather than having to prove the patient would have survived if properly treated. The plaintiff does have the burden of establishing by a preponderance of the evidence, that the defendant's conduct denied the patient a chance of survival. R. pp. 420, 421.
These instructions point out the law of Smith and Tabor, supra, that the plaintiff need only *576 prove that the patient had and lost a chance of survival (not that she would have survived) as a result of the defendant's conduct, and that this conduct need not have been the sole cause. This is equivalent to saying the defendant's conduct was a substantial factor in bringing about the harm. See Hastings v. Baton Rouge Gen'l Hosp., 498 So.2d at 720. The trial court is not required to use the precise instructions submitted by a litigant. Scheidt; Doyle, supra. Considering the jury charge as a whole, we conclude that it correctly and adequately states the law relevant to causation in a medical malpractice case.

Joint Motion in Limine Regarding Wrongful Death and Survival Damages
By their fifth assignment, Dr. Jones and PCF contend the trial court erred in denying defendants' motion to exclude any evidence by plaintiff related to (1) survival damages for his mother's heart condition and (2) plaintiff's own wrongful death action. Regarding the survival action, defendants claim that plaintiff failed to properly allege it in his petition. Plaintiff's wrongful death claim, they asserted, had prescribed under La.R.S. 9:5628; they filed an exception of prescription, which was also denied. Dr. Jones and PCF contend this was error. We note that the jury did not award survival damages to Jess Rowsey, Jr. on his mother's behalf for her heart attack; the argument pertaining to this issue is moot. We therefore address only the issue of prescription as to plaintiff's wrongful death action.
The following is the uncontested procedural chain of events:
 2/16/89 Mr. and Mrs. Rowsey file a complaint requesting
 the formation of a review panel.
 12/3/89 Mrs. Rowsey dies.
 6/6/90 Mr. Rowsey amends complaint to substitute
 Jess Rowsey, Jr. as surviving son of Mrs.
 Rowsey.
 10/23/90 Mr. Rowsey dies.
 1/31/91 Medical Review Panel renders its decision.
 4/29/91 Jess Rowsey, Jr. files petition in district
 court.
Since defendants' motion was filed, the Supreme Court has clarified the issue of prescription as it relates to both survival and wrongful death actions. Wrongful death actions are governed by the one year liberative period in La.C.C. art. 3492. Taylor v. Giddens, 618 So.2d 834, 841 (La.1993). The date of the victim's death starts the running of prescription. Thus, Jess Rowsey's wrongful death claim, filed over one year after his mother died, has prescribed on its face.
Normally, the party pleading prescription bears the burden of proof; however, if the claim is prescribed on its face, the burden shifts to the plaintiff to prove a suspension or interruption of the prescriptive period. Younger v. Marshall Industries, Inc., 618 So.2d 866, 869 (La.1993). Jess Rowsey argues that prescription was suspended when he presented his claim to the medical review panel. La.R.S. 40:1299.47 A(2)(a) provides that the filing of the request for a review of a claim shall suspend the time within which suit must be instituted until ninety days following notification of the panel's decision by certified mail. Dr. Jones and PCF contend that prescription was not suspended because Jess Rowsey, Jr. did not file a complaint under the Louisiana Medical Malpractice Act.
Jess Rowsey, Jr.'s wrongful death claim obviously could not arise until his mother's death. Six months later, Jess Rowsey, Jr. joined the medical review panel petition as a complainant. The question is whether this action was sufficient to suspend the running of prescription on his wrongful death claim.
The medical review panel is a pre-trial screening procedure designed to give both parties a preliminary view of the merits of the case. Everett v. Goldman, 359 So.2d 1256, 1264 (La.1978). As part of this scheme, the panel's deliberation suspends the running of prescription until 90 days after *577 notice of the decision is sent. La.R.S. 40:1299.47 A(2)(a). Here, the malpractice complaint, as amended to include Jess Rowsey, Jr., was properly and timely presented to the medical review panel, thus suspending prescription on his wrongful death claim as set forth in the Medical Malpractice Act. The petition was then timely filed in district court within 90 days of transmission of the medical review panel's decision.
Moreover, prescription statutes are intended to protect defendants against stale claims and the lack of notification of a formal claim within the prescriptive period. Giroir v. South La. Medical Ctr., 475 So.2d 1040, 1045 (La.1985). In the instant case, the defendants were put on notice that Jess Rowsey, Jr. would seek judicial relief for injury arising out of the general factual situation alleged when he joined in his parents' claim. Consequently, we find no error in the trial court's denial of defendants' motion in limine and exception of prescription.

Quantum
Finally, we address the concerns of all appellants that the jury abused its discretion in awarding damages. In addition to urging the awards were abusively high, Dr. Jones and PCF contend that the jury erred in awarding medical expenses because plaintiff failed to prove that the bills were related to the negligent treatment for cancer.

I. General Damages
On review we must first determine whether the award, given the effects of the particular injuries on the plaintiff under the particular circumstances, is a clear abuse of the "much discretion" of the trier of fact. La.C.C. art. 1999; Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), and citations therein. Only after finding an abuse of discretion is it appropriate to resort to prior awards to determine the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976). In light of the fact that the discretion vested in the trier of fact is "great," even vast, an appellate court should rarely disturb an award. Youn, supra.
On the cancer claim, the jury awarded $100,000 to Mr. Rowsey for loss and deprivation of companionship, love and affection, assistance and mental anguish, and $75,000 to Mrs. Rowsey for her physical pain and suffering, mental anguish, and loss of enjoyment of life.
Jess and Lula Rowsey were married in 1946. Jess Sr. described their relationship as "excellent." Lula Rowsey was "easygoing," according to Lula's sister, Mable Fuller. Lula enjoyed gardening, shopping, playing bingo, having garage sales, and going fishing with her husband; she visited the aging and sick at retirement homes; she watched over her elderly neighbor, bringing her three meals a day; and she cared for her own family, cooking and cleaning for them. Lula would travel with her husband when his work took him out of town. But in February 1986, her personality, demeanor, and outlook on life changed dramatically. She was told she was suffering from terminal lung cancer and had less than a year to live.
Lula's husband testified in deposition that his wife became "hysterical" when told this news. Mable testified that Jess Sr. seemed more upset than his wife, but both cried constantly. Lula became very agitated and argumentative after she began chemotherapy. She became hostile and started fighting with both her husband and son. Lula would stay in bed all day; she stopped cooking and cleaning, and Jess Sr. assumed these chores. These personality changes remained until her death. Jess Sr. tried part-time work initially, but was soon forced to quit entirely to care for his "dying wife"; he did not work after September 1987. Her condition destroyed their physical and emotional relationship and caused a severe financial strain. Jess Rowsey, Jr. testified that his mother's condition ruined his father. In short, Lula and Jess lived each day knowing that she was dying, and thinking each day would be her last. At least two and a half years of their needless suffering could have been prevented. While we may consider the award to Mrs. Rowsey somewhat on the low side, we nevertheless do not deem it or the award to *578 Mr. Rowsey to be an abuse of the jury's discretion.
Next, we consider the $45,000 and $40,000 awards to Jess Rowsey and his son, respectively, for the loss and deprivation of companionship, love and affection, assistance, and mental anguish as a result of Lula Rowsey's wrongful death.
Jess Rowsey had a close and loving relationship with his wife of 43 years. They enjoyed spending time together, traveling and fishing. Jess cared deeply for Lula as evidenced by his willingness to leave his job and give up all recreation to stay home and nurse her. Unfortunately, Jess did not live long after his wife passed away; he died just eight months later. The jury obviously took this into account in awarding only $45,000. In light of the evidence, we do not deem this amount to be an abuse of discretion. It will be affirmed.
Jess Rowsey, Jr. was close to his mother; he lived with his parents from 1979 to 1983, then moved back in again between 1985 and 1988. Jess testified that he went fishing with his mom and dad and took his mom to play bingo. Although he moved to Mississippi in 1988, he called his mother almost every day and visited once a month. Again though we consider the award to be on the lower end of the scale, on this record, the jury did not abuse its discretion in awarding Jess Rowsey, Jr. $40,000 for the wrongful death of his mother.

II. Medical Expenses
Dr. Jones objected to plaintiff's introduction of medical bills at trial. It was agreed that the hospital bill for E.A. Conway Hospital would be stricken; however, all other bills were allowed into evidence. Dr. Jones and PCF now reurge the relevancy objection on appeal.
Medical expenses, past and future, which are incurred by an injured plaintiff are recoverable as an element of damages. Thames v. Zerangue, 411 So.2d 17 (La.1982); Beckham v. St. Paul Fire & Marine Ins., 614 So.2d 760, 771 (La.App. 2d Cir.1993). Allegations that certain medical expenses were incurred and presentation of the bills, absent sufficient and contradictory evidence or reasonable suspicions that the bill is unrelated to the accident, is sufficient to support the inclusion of the item in the judgment. Landry v. City of Abbeville, 625 So.2d 655 (La.App. 3rd Cir.1993), writ denied, 93-2820 (La. 1/28/94), 630 So.2d 789; Brightman v. Regional Transit Authority, 543 So.2d 568 (La.App. 4th Cir.1989).
Despite the agreement at trial, the record shows that the E.A. Conway bill was submitted to the jury. In addition, we find three other bills which were clearly unrelated to Mrs. Rowsey's cancer; one is for a head CT scan taken at St. Francis Medical Center to establish the post operative status of a craniotomy; the other two are associated with her one day hospital stay in April 1988 when she was admitted by Dr. Meyers for low blood sugar associated with diabetes. Dr. Jones admitted he was never involved in this hospitalization. It appears that the jury did not consider either the E.A. Conway or St. Francis CT scan bills in calculating medical expenses. Therefore, minus the bills for $208.40 and $97.00 associated with her April 1988 hospitalization, the award will be affirmed.

Conclusion
The portion of the judgment awarding medical expenses is amended ($11,277.76) to reflect only those charges proven to have been incurred in connection with the cancer diagnosis. For the reasons expressed, the judgment in all other respects is affirmed. Costs are assessed to appellants, Dr. Henry Jones and the Patients' Compensation Fund.
AMENDED AND AFFIRMED.
NOTES
[1] The medical experts explained in detail at trial the difference between cytology, the study of cells, and histology, the study of tissue. Cytology is 97 percent accurate, but in 3 percent of cases there is a false positive; that is, the cells look malignant but are actually not. This condition is usually caused by some inflammatory condition that causes the cells' appearance to mimic cancer cells, and there is no way for a pathologist to tell the difference. Histology is 99 percent accurate; it does not have the above limitation and is therefore thought to be superior in most cases to cytology. However, in some instances obtaining tissue may heighten the risk to the patient, as Dr. Maran felt was the case with Mrs. Rowsey.
[2] Large cell undifferentiated carcinoma is a "wastebasket classification" for immature cells which have not differentiated enough to be able to determine the exact type of cancer cell.
[3] We note the testimony of other experts, the majority of whom were not pathologists, that consultation between pathologists and the clinicians does occur on occasion and is an admirable practice; however, the record does not establish that the standard of care requires pathologists to consult the clinicians. Dr. Bucklin himself did not testify that the pathologists must initiate discussions with the clinicians to meet the standard of care, but merely called it a "desirable practice." R. p. 796.
[4] St. Francis's liability under respondeat superior is predicated on a finding of liability on the part of the pathologists. We therefore pretermit discussion of plaintiff's third assignment concerning St. Francis's dismissal as a party defendant on motion for directed verdict.