Judgment rendered February 25, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,785-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

JOANNE GRAFTON AND BILLY                    Plaintiff-Appellants
GRAFTON, INDIVIDUALLY AND
ON BEHALF OF THE ESTATE OF
SHELLY GRAFTON

versus

ELIZABETH HAMMOND                           Defendant-Appellee
EDWARDS

* * * * *

Appealed from the
Second Judicial District Court for the
Parish of Claiborne, Louisiana
Trial Court No. 40197

Honorable Walter Edward May, Jr., Judge

* * * * *

NELSON & HAMMONS                            Counsel for Appellants
By: John L. Hammons

NEBLETT, BEARD & ARSENAULT
By: Wesley Jeff Gralapp
    Matthew J. Crotty

JOSEPH J. LONG

HUDSON, POTTS & BERNSTEIN, LLP              Counsel for Appellee
By: Gordon L. James                        Pamela Hearn, M.D.

COLVIN, SMITH & McKAY                    Counsel for Appellees
By: James H. Colvin, Jr.                 Claiborne Parish
    Daniel N. Bays, Jr.                   Hospital Service District
                                         #3 d/b/a Claiborne
                                         Memorial Medical
                                         Center f/k/a Homer
                                         Memorial Hospital and
                                         Camille Wise, FNP


* * * * *


Before THOMPSON, HUNTER, and MARCOTTE, JJ.


THOMPSON, J., concurs with written reasons.

**MARCOTTE, J.**

This civil appeal arises from the Second Judicial District Court, Parish of Claiborne, the Honorable Walter E. May, Jr. presiding. Plaintiffs Joanne Grafton ("Joanne") and the estate of her daughter, Shelly Grafton ("Shelly"), appeal the trial court's judgment finding that there was no medical malpractice and dismissing with prejudice plaintiffs' claims against three defendants. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On March 15, 2016, Joanne and her husband, Billy Grafton,[1] individually, and on behalf of Shelly's estate filed a petition for damages alleging medical malpractice, with wrongful death and lost chance of survival claims against (1) Claiborne Memorial Medical Center/Homer Memorial Hospital ("CMMC"), (2) CMMC employee Camille Wise FNP ("Nurse Wise"), and (3) Dr. Pamela Hearn ("Dr. Hearn"), the doctor for the Claiborne Parish Detention Center where Shelly was an inmate.

Plaintiffs stated that, on or about December 15, 2012, Shelly developed an abscess in her stomach. Plaintiffs claimed that her condition deteriorated, she had a "syncopal episode," and she was transferred from the jail to CMMC. There Shelly was diagnosed with cellulitis of the abdominal wall, was given medications, including IV antibiotics, and discharged the same day. She returned to the detention center. Her condition continued to decline, but she did not go back to the hospital. She died on December 21, 2012. A medical review panel was convened, and the panel rendered an

---

[1] Billy Grafton died while the case was pending; his surviving children declined to pursue his claims.

opinion finding that there was medical malpractice. Defendants answered the petition and denied all claims.

Following motion practice, the case proceeded to a bench trial. Shelly's CMMC medical records were admitted and stated that on December 15, 2012, she was admitted to the emergency department at 6:37 p.m. Shelly reported to Nurse Wise, "I think I have staph." Nurse Wise was informed that Shelly had a syncopal episode for about 2-3 minutes, meaning she temporarily lost consciousness. Shelly reported that her pain level was 8/10. Her blood pressure was 105/55, her pulse was 106, her respiration was 22, and her temperature was 100.3. Nurse Wise noted a .75 cm open area with 2 cm of tunneling in a southern direction on Shelly's abdomen.

Nurse Wise ordered lab work and diagnosed Shelly with cellulitis of the abdominal wall. Nurse Wise gave Shelly Dramamine and Zofran, for nausea, Zyvox, an IV antibiotic, and Tylenol, for pain and fever. By 8:00 p.m., her blood pressure was 99/54, her pulse was 102, her respiration was 18, and her temperature was 99.9. At some point Nurse Wise opened, drained, and packed her abscess. Shelly left the hospital at 9:30 p.m. with a pain level of 3/10. Shelly's discharge instructions said to continue packing her opened abscess once per day until it healed. The instructions also said that if Shelly had persistent vomiting or severe lightheadedness, she should be evaluated by a doctor.

Shelly's jail records were admitted. They stated that she had a gastric bypass and stomach stapling procedures, and she was prescribed Cholestyramine for diarrhea. On December 11, 2012, Shelly requested medical care for a large, red "knot" on her stomach that was not draining,

and that she suspected was staph. Nurse Elizabeth Edwards ("Nurse Edwards"), who treated inmates at the women's jail, said that Shelly went to the ER on December 15, 2012, for a boil on her left abdomen. It appears from the records that the jail did not respond to Shelly's complaint until December 15, 2012.

On that date, Nurse Edwards noted that the ER personnel packed and dressed the boil, and the packing and dressing were to be changed once per day. She noted that the ER prescribed Bactrim and Cleocin, two antibiotics. A later note said that Shelly had a boil on her abdomen, and she was instructed to take Bactrim for 10 days and apply a warm compress to the area. Nurse Edwards did not record Shelly's vitals in any of her nurse's notes.

The jail did not begin to administer antibiotics to Shelly until December 18, 2012. Shelly's medication administration record shows that she was supposed to receive Clindamycin three times a day, but she received one dose each morning during the period of December 18-21, 2012, and one dose in the evening on December 19, 2012. The jail administered one dose of Bactrim to Shelly at 5 p.m. on December 19, 2012. The jail gave Shelly two doses of doxycycline, one at 5 p.m. on December 20, 2012, and one the following morning.

On December 17, 2012, Nurse Edwards wrote that Shelly was seen at the hospital for a boil on her abdomen, and she was prescribed Bactrim and Cleocin. The note said Shelly's wound measured one inch in diameter by two inches deep. The area surrounding the wound was red with a small amount of drainage. Nurse Edwards said that there was no foul odor coming

from the wound. The wound was cleaned, repacked, and dressed. Nurse Edwards noted the same on December 18, 2012, adding that there was scant drainage at the wound site. Nurse Edwards said that Shelly complained of nausea and pain and that she was unable to eat or drink. Nurse Edwards advised Shelly to drink fluids as tolerated and to eat to keep her strength up. She prescribed Shelly Dramamine and ibuprofen.

On December 19, 2012, Nurse Edwards wrote that Shelly continued to have nausea and could not eat. The nurse advised Shelly to continue to take Dramamine and to eat before taking an antibiotic. Nurse Edwards said that she notified Dr. Hearn, who ordered that Shelly start taking doxycycline instead of Bactrim. Nurse Edwards said that Shelly's incision remained the same. She noted swelling and scant drainage at the wound site. Nurse Edwards cleaned, packed, and dressed the wound.

On December 20, 2012, Nurse Edwards noted that Shelly's wound looked better, with no redness or foul odor coming from it. She cleaned, packed, and dressed the wound. In a nurse's note dated December 21, 2012, Nurse Edwards wrote that the size of Shelly's abdominal incision remained unchanged, but that it had no odor, redness, or swelling. She again cleaned, packed, and dressed the wound.

On December 21, 2012, Nurse Edwards made the following note (verbatim):

> 12/21/12 @ approximately 1340 Deputy Tate called me about an offender who was calling out from dorm to her. Deputy Tate went to dorm to see what was wrong. Offender Grafton was lying on floor stating that she felt bad & needed her B-12 shot. At this time, Deputy Tate called me. I instructed Deputy Tate to place offender in holding cell so she could be monitored. I asked Deputy Tate if she had any [signs] of distress. No [signs] were noted. I informed Deputy Tate that I would be there later

4

to check on her and that if there were any changes to her condition to contact me. At approximately 1424, Deputy Tate notified me that offender c/o difficulty breathing. Offender was talking, coherent, and showed no signs of respiratory distress. I informed Deputy Tate that I would notify Dr. Hearn and get back with her. At approximately 1430, I notified Dr. Hearn. Orders noted to continue to monitor offender. If condition changed, then send to ER. At approximately 1435, I notified Deputy Tate of orders. At approximately 1445, Deputy Tate notified me that inmate was non-responsive. I told her to call an ambulance and that I was on my way to CPSO. Upon my arrival at CPSO, ambulance was on scene and CPR was in progress. I assisted the paramedics. ER Doctor was notified, who instructed to continue CPR and to transport to hospital. Ms. Grafton was pronounced dead at the hospital at 1552.

An incident report written by Deputy Tate stated the following

(verbatim):

At approx. 1340, I, Deputy LaShenda Tate entered cell 300 and absorb [*sic*] inmate Shelly Grafton lying on the floor. I, Deputy Tate, then called inmate Shelly Grafton by name asking what happen. Inmate Christina Bowen…stated she didn't know that Grafton was on the floor. I then got assistance from offenders…to help place Shelly in cell 600 so I could keep watch on her until Nurse Edwards arrive. At 1345 I called Nurse Edwards to make her aware of what happen. I advise Nurse Edwards Grafton stated it was hard to breath and she wanted to go to the ER and she wanted to know about a shot that she takes. Nurse Edwards stated she would be here as soon as she finished training their Lt. on medical situation. 1406 I went into cell checking on Grafton, telling her Nurse Edwards would be here shortly. 1423 I Deputy Tate called Nurse Edwards concerning Grafton. I told the nurse I wanted her come check on Grafton breathing and I wasn't certain of what to look for. Nurse stated she would call Dr. Hern to put my mind at ease and she would call me back. 1430 Nurse Edwards called back stating Dr. Hearn said to tell Grafton we don't just take offender to the ER because they ask to go. 1446 I Deputy Tate checked on Grafton. Grafton didn't respond to me when I called her by name. I checked for a pulse and didn't feel a pulse. Pafford ambulance was called by Deputy Walter Johnson. I called Nurse Edwards to inform her to get here. 1452 Pafford arrive and began to treat Grafton. 1512 Pafford exit with Shelly Grafton going to [CMMC].

Shelly's death certificate was submitted. It was signed by Donald

Haynes and stated that she died on December 21, 2012, and her cause of

death was sepsis due to abdominal small abscess and cellulitis. An autopsy report was submitted which was signed by Dr. Frank Peretti ("Dr. Peretti"). Dr. Peretti described Shelly as a 46-year-old, white woman who "died of sepsis due to abdominal wall abscess and cellulitis with the contributory factor of fracture of thoracic spine." He said that her underlying thoracic spinal cord was intact and uninjured. Shelly also had a broken posterior rib and multiple muscle hemorrhages on her right side, and a contusion on the back of her head. The report said that Shelly slept on a lower bunk, and she was found lying on the floor face up and could not get up. She was assisted by jail personnel and other inmates, and she reported being in "excruciating pain." After transferring to another cell block, she became unresponsive. Shelly's toxicology report showed the presence of antidepressants and Benadryl but no antibiotics.

The other jail records stated that Shelly had multiple medical issues including dwarfism, a history of staph infections, and bilateral knee problems. Several inmates who lived in Shelly's cell block reported that Shelly fell and was transported to the hospital; she returned a few hours later saying she had a staph infection and was dehydrated. The inmates reported that Shelly's condition slowly deteriorated over the next several days. They said that she had persistent vomiting, nausea, was unable to get out of bed on most days, and the inmates had to bring her food and water, which she was unable to keep down. The inmates said that several guards were "mean" to Shelly and believed her to be faking or making her symptoms out to be worse than what they were.

One guard gave a statement saying that an inmate had to sign paperwork for Shelly because she could not move her arms. Several guards also gave statements saying that they believed Shelly was faking or overdramatizing her condition. After her death, an envelope containing 15 pills and a packet of Cholestyramine powder were found with Shelly's possessions at the jail.

Dr. Peretti noted that Shelly was morbidly obese, she had an abundant amount of abdominal fat, and the skin of her abdomen showed cellulitis. He said that the sepsis had progressed to her spleen, and her abdomen contained a half-inch orifice surrounded by necrotic tissue, which was packed with gauze. The depth of the orifice was 2.5 inches. Incision into the area showed an "abundant amount of yellow-green foul-smelling purulent material." The abscess was in the fatty tissue only and did not extend into the abdominal cavity.

Dr. Peretti's deposition testimony was admitted. He was tendered as an expert in the field of forensic pathology. He agreed that Shelly's rib fracture could have occurred during CPR. Dr. Peretti said that Shelly fell and hit her head, but she had no evidence of skull fractures or a brain injury. He testified that her abscess was "severe" and necrotic, meaning it was dying tissue with a foul odor, and it was contained to the fatty tissue at the front of her abdomen and did not extend into the abdominal cavity. Dr. Peretti said that sepsis was unpredictable and could form in hours or days; some people died from it immediately, while others lingered for a few days before dying.

Dr. Peretti testified that Shelly had no other cause of death than sepsis. She had no brain or spinal injury and no blood clot. He stated that Shelly did not have cardiovascular disease, but she did have swelling in her lymphatic system due to sepsis and her spleen was septic. Dr. Peretti said he concluded that Shelly fell, broke her back, and possibly her rib, and injured her head. He testified that Shelly's toxicology screen did not show the presence of antibiotics.

The medical review panel report was admitted. It was signed on December 31, 2015, by Dr. John Giroir ("Dr. Giroir"), Dr. Kay Kovac ("Dr. Kovac"), and Dr. David Hudson ("Dr. Hudson"). The panel concluded that Nurse Wise failed to comply with the appropriate standard of care in treating Shelly. The report stated (verbatim):

> Shelly Grafton presented to the [CMMC] emergency department on December 15, 2012, reporting she had a syncopal episode and an abscess on her abdomen. She was examined by Camille Wise, FNP. The patient was having mild tachycardia with a pulse of 106 and a low grade fever of 100.3°F. Her initial blood pressure was 105/55. Patient was found to have a large area of cellulitis on the lower abdomen. Camille Wise, FNP felt that this area needed an incision and drainage which she performed in the emergency department. Patient was given IV antibiotics to treat the cellulitis. Patient's repeat vital signs revealed a blood pressure 99/54 that was slightly lower than the initial blood pressure and the patient remained mildly tachycardic with pulse of 102. Patient's temperature had come down to 99.9°F. The patient had laboratory evaluation which had some abnormal values. The patient had a CBC [Complete Blood Count] which revealed a white blood cell count of 7,600. Even though this white count is not elevated the differential was concerning as it showed 69% segmented neutrophils and 4% banded neutrophils. 4% banded neutrophils could indicate this patient having some component of systemic infection with a bandemia starting. Patient had some chemistries which were also abnormal. Patient had a BUN of 34 and creatinine of 1.5 with GFR (glomerular filtration rate) infiltration rate showing 40. GFR calculations indicate how well kidneys are functioning. A normal GFR is greater than 90. This GFR of 40 indicated the patient was

either dehydrated or had some component of chronic renal failure. Patient's CO2 value on her chemistries was 17 which is low. Patient had a low albumin measuring 2.2 and a low total protein measuring 6.3. All these labs indicated a patient that may have a chronic medical condition which could worsen her outcome for having a moderate to severe infection. We feel that with this in mind the nurse practitioner should have at least contacted her supervising physician for further input on the definitive disposition and final treatment for this patient. At the very least, her discharge instructions should have included that the patient be seen in follow up by a physician within twenty-four hours. These deviations below the standard of care were factors in the patient's death.

The panel also concluded that Dr. Hearn failed to comply with the appropriate standard of care in treating Shelly. The panel stated (verbatim):

In December 2012, Dr. Hearn was the physician responsible for treatment of inmates at the Claiborne Parish Women's Jail. On December 19, 2012, Dr. Hearn was notified by the jail nurse of Ms. Grafton's emergency room visit on December 15, 2012, the treatment and prescriptions she received there and that Ms. Grafton was unable to eat due to nausea. With this information, Dr. Hearn should have that day either examined Ms. Grafton herself to evaluate this patient or given orders for Ms. Grafton to be taken back to the emergency room so she could be evaluated there. Further, Dr. Hearn should have obtained Ms. Grafton's vital signs. On December 21, 2012, Dr. Hearn was notified by the jail nurse that Ms. Grafton had been lying on the floor stating that she felt bad. In light of the prior history, Dr. Hearn should have ordered that the patient be immediately transferred to the nearest emergency room. These deviations below the standard of care were factors in the patient's death.

Plaintiffs submitted Dr. Kovac's deposition testimony. She affirmed what was in the medical review panel's report regarding Nurse Wise's and Dr. Hearn's failure to meet the standard of care in treating Shelly. She said that the antibiotic that Nurse Wise prescribed, Bactrim, and the one Dr. Hearn prescribed, doxycycline, were inappropriate given that Shelly had nausea and was not eating. She said that each antibiotic caused irritation to the GI tract, which would have made Shelly's nausea symptoms worse.

9

The deposition testimony of Dr. Gil Redelman-Sidi ("Dr. Sidi") was admitted. He was accepted and testified as an expert in infectious disease and internal medicine, and he worked in an emergency room setting during a three-year residency. He practiced in New York at Sloan-Kettering Cancer Center and was an assistant professor of medicine at Cornell Medical College. He testified that he had never treated prison inmates. He stated that when Shelly was seen at CMMC on December 15, 2012, her blood tests showed abnormal kidney function. He compared her tests at that time to those Shelly had done in January 2012 at the Green Clinic; those records showed normal kidney function.

Dr. Sidi specified that her CMMC blood tests showed that (1) Shelly's creatinine was 1.5, when normal levels would be up to 1.0, and it was at 0.55 at the Green Clinic; (2) she had an elevated blood urea of 34, when the normal value was 18 or less; (3) her $CO_2$ level was 17, when the normal range was 21 to 32; (4) her hemoglobin was 8.1, which was low; and (5) her albumin level was abnormal. He said those irregular findings were associated with sepsis among other conditions.

Dr. Sidi also referenced Shelly's qSOFA, or quick Sequential Organ Failure Assessment score. He testified that the qSOFA score was used to determine the early signs of sepsis, "especially in the emergency room setting." He said that the scoring system used three parameters to determine the score, which included the respiratory rate, the presence of altered mentation, and the systolic blood pressure; a score of two or above was considered evidence of early sepsis. Dr. Sidi testified that Shelly had a qSOFA score of two because her respiratory rate was 22 and her systolic

10

blood pressure was less than or equal to 100. He stated that Shelly's qSOFA score, coupled with her vital signs, blood test abnormalities, and her elevated pulse of 106, indicated that sepsis was likely in her case.

Dr. Sidi stated that sepsis caused an abnormal expansion of blood vessels in the body and decreased output of blood from the heart. Therefore, there was less delivery of blood to the tissues, including the kidneys, which led to an accumulation of various toxins that the kidneys normally get rid of, including creatinine, causing potential renal failure. Dr. Sidi acknowledged that nausea and vomiting could cause dehydration, which could cause creatinine and blood urea nitrogen levels to be abnormal. He said that Shelly's CMMC records did not show that Nurse Wise diagnosed Shelly with dehydration.

Dr. Sidi noted that Nurse Wise did not mention sepsis in her diagnosis, and it was his opinion that she should have. He testified that Nurse Wise's initial treatment of IV antibiotics and drainage of her abscess were appropriate, but he found that discharging Shelly with instructions to take oral antibiotics was not appropriate. Dr. Sidi said that she should not have been discharged until her vitals stabilized and that Shelly should have continued IV antibiotics and monitoring at the hospital. Dr. Sidi agreed that if CMMC was not a secure hospital that could care for an inmate, then it should have transferred Shelly to a facility that could provide that care. He concurred that discharging Shelly to the jail to be managed by a jail nurse, when Shelly had a diagnosis of sepsis, was substandard care.

While looking at Shelly's jail medical records, Dr. Sidi noted that, following her December 15, 2012, visit to CMMC, Shelly took the antibiotic

11

clindamycin four mornings and one evening prior to the date of her death on December 21, 2012. Dr. Sidi said that was unusual because clindamycin was typically administered three times a day and was less effective otherwise. He testified that Shelly was administered Bactrim once, which was typically administered twice a day, and she was given doxycycline once, which was also typically administered twice a day.

Dr. Sidi stated that Shelly's microbiology report from her wound culture said that the infection she had was susceptible to clindamycin. Dr. Sidi said he could not speculate if Shelly regularly being administered clindamycin orally would have successfully treated her infection because "you don't know if you're achieving the appropriate levels of antibiotic in the blood." He said the frequent practice was to treat serious infections with IV antibiotics. Dr. Sidi testified that a broken backbone could lead to death if the spinal cord was injured, which in Shelly's case was not.

Dr. Hudson's deposition testimony was admitted. He was tendered as an expert in family practice. Dr. Hudson stated that the medical review panel found Shelly's white blood cell count from her CMMC lab work concerning. He stated that a body's neutrophil count increases when it is trying to fight a bacterial infection. He said banded neutrophils were immature neutrophils that were "being rushed out" of the bone marrow, where the body stores neutrophils, before they completely matured to help fight the infection. Dr. Hudson testified that Shelly's white blood cell count included immature neutrophils, which the panel believed was a sign that her body was fighting a systemic infection.

Dr. Hudson said Shelly's CMMC lab work showed that her kidneys were not functioning correctly, and that she was likely dehydrated and malnourished. Dr. Hudson affirmed the medical review panel's opinion and findings. Dr. Hudson said that he did not see any evidence that Nurse Wise consulted with her supervising physician before discharging Shelly from CMMC's care. He reiterated that at the very least Nurse Wise should have provided in Shelly's discharge instructions that a physician see her for follow-up care.

Testifying about Dr. Hearn's actions, Dr. Hudson stated that she was made aware that Shelly had had an incision and drainage on December 15, 2012. He said that on December 19, 2012, Nurse Edwards informed Dr. Hearn that Shelly was unable to eat due to nausea. Dr. Hudson affirmed that his opinion was that Dr. Hearn should have evaluated Shelly that day or given orders for Shelly to be transported to CMMC. Dr. Hudson also believed that Dr. Hearn should have ordered the jail nurse to take Shelly's vital signs. Dr. Hudson agreed that Dr. Hearn had no way of assessing Shelly's condition when Nurse Edwards called her on December 19, 2012. Dr. Hudson agreed that Shelly remained in the jail untreated and unevaluated for two more days. Dr. Hudson reiterated that Dr. Hearn's lack of action on December 21, 2012, when Nurse Edwards informed her that Shelly was found lying on the floor saying she felt bad, was below the standard of care and was a factor in Shelly's death.

Dr. Hudson, while looking at the autopsy report, said that Shelly's sepsis had progressed to Shelly's lymphatic system, specifically her spleen and abdominal lymph glands, which was the system responsible for

13

defending against infection. Dr. Hudson said that the normal progression of sepsis would have been in a hospital with IV antibiotics from the first day the infection was seen.

Dr. Hudson said that he would not have drained Shelly's abscess first but would have had her take an antibiotic for at least 24 hours prior to any incision and drainage to make it easier to deal with the infection. He said that cutting through infected skin to an abscess increases the risk of bloodborne infection because incising the capillaries provides an opening for the infection to spread more rapidly through the bloodstream. Dr. Hudson said that Nurse Wise's choice of incising Shelly's abscess without prior antibiotic prophylaxis increased the risk that her infection would spread. He said that the IV antibiotics Shelly received at CMMC "was good for a few hours, then it was metabolized out of the system, and she no longer had protection against infection."

Dr. Hudson testified that if he saw a patient under circumstances identical to Shelly's, with similar lab work and unable to eat, he would want to know her vital signs and get additional lab work to look for a progressing infection. Dr. Hudson said a patient who is septic does not necessarily have additional pain and drainage from an abscess. Dr. Hudson agreed that, if Shelly had no vital signs on December 21, 2012, within 15 minutes of Dr. Hearn being informed of her condition, that there was not much the doctor could have done at that time to preserve her life.

Dr. Giroir was accepted as an expert in family medicine. He testified that he worked in emergency rooms for his entire career, beginning in 1987, when he graduated from medical school. Dr. Giroir affirmed his medical

14

review panel opinion. He stated that Shelly had a slightly elevated pulse, low blood pressure, and a fever when she was at CMMC. He testified that her fever and pulse improved slightly, but her blood pressure was lower than it was when she went to the hospital. Dr. Giroir said that a person can have a normal white blood cell count but still have an infection. Dr. Giroir said that an increased neutrophil count can show that the body is fighting infection. He said that the presence of banded neutrophils in Shelly's CBC, which he referred to as "bandemia," meant that her body was trying to rush those immature cells out before they had a chance to mature to fight an infection in her body. Dr. Giroir stated that bandemia could be an early sign of sepsis.

Dr. Giroir testified that he frequently diagnosed patients with sepsis in his work in emergency medicine. He said there are indicators for the possibility of sepsis, such as heart rate, blood pressure, temperature, respiratory rate, and white blood cell and platelet counts. Dr. Giroir stated that the more indicators you see, the more obvious it is that the patient has sepsis. Dr. Giroir said that, in his opinion, Shelly died of sepsis. Dr. Giroir said that Shelly's BUN, creatinine levels, and GFR showed that her kidneys were not functioning to clear toxins from her body and she had renal insufficiency. He also said that Shelly's $CO_2$ level was low; $CO_2$ acts as an "important buffer mechanism in the body." He said her albumin level was low, which could indicate renal problems or nutritional issues. Dr. Giroir testified that Shelly's total protein was also low, which showed metabolic issues or poor nutritional status.

Dr. Giroir agreed that Nurse Wise should have contacted her supervising physician about Shelly's complaints and abnormal lab values and admitted her to the hospital; he said the failure to do so was breach of the standard of care. Dr. Giroir said that Nurse Wise should have realized that Shelly needed a higher level of care than CMMC could provide and transferred her to a facility that could provide that care. He also agreed that Nurse Wise's follow-up instructions should have said that Shelly was to be re-examined by a physician within 24 hours, and her failure to do so violated the standard of care.

Dr. Giroir testified that Dr. Hearn violated the standard of care when Nurse Edwards notified her on December 19, 2012, about the prescriptions and treatment that Shelly received at CMMC and told the doctor about her inability to eat due to nausea, and she did not examine Shelly herself or order that she be transferred to the ER. He also said that Dr. Hearn should have obtained Shelly's vital signs on that date. Dr. Giroir said that Dr. Hearn breached the standard of care when, on December 21, 2012, Nurse Edwards informed her that Shelly was found lying on the floor and said that she felt bad, and the doctor did not order that she be transferred to the nearest ER.

Dr. Giroir said that Shelly's chance of survival would have been much greater if they had provided her with more aggressive treatment. He said that Nurse Wise did not treat Shelly appropriately because, in his opinion, she inadequately drained Shelly's abscess, which was deep in her tissue. Dr. Giroir said that Shelly's hospital tests did not show the presence of infection

16

in her blood, but her wound site did. He agreed that Shelly was not septic when she was seen at CMMC on December 15, 2012.

Dr. Giroir confirmed that the medical review panel did not discuss Shelly's spinal or rib fractures, her head contusion, or her septic spleen.

Dr. Giroir stated that Shelly's toxicology report showed that (1) she had 810 ng/mL of Citalopram, an anti-depressant, in her system at her time of death, and the therapeutic range for that drug was 10-210 ng/mL; (2) she had 1,248 ng/mL of Benadryl in her system at her time of death, and the therapeutic range for that drug was 30-300 ng/mL; (3) she had 42.1 ng/mL of amitriptyline in her system at her time of death, which was within the therapeutic range, but she was not prescribed that medication. No antibiotics were detected in Shelly's system.

Joanne Grafton testified that Shelly pled guilty to embezzling funds from her employer. She testified that she visited Shelly at the jail during the week before her death, but Shelly was too ill to meet with her.

Nurse Wise was accepted as an expert family nurse practitioner. She testified that she started work in the ER at CMMC in 2005. While doing that work, Nurse Wise had a "collaborating physician" that she consulted with at her discretion. She saw Shelly at around 6:30 p.m. on December 15, 2012. Nurse Wise said that Shelly was alert, awake, and speaking to her. She said Shelly's blood pressure was normal, her heart rate was elevated, she had a slight fever, and some shortness of breath. Nurse Wise performed an overall exam of Shelly and noted that she had a tender, red area to her abdomen with a little drainage. She testified that she did not need to incise the area because it was already open and draining; she explored the cavity

17

and said that there was tunneling, which contained pockets of pus. Nurse Wise said that the wound went two centimeters in five directions. A culture of Shelly's wound showed that it was infected with MRSA.

Nurse Wise started Shelly on the broad-spectrum IV antibiotic Zyvox. Nurse Wise said that Shelly had "a little bit of chronic kidney disease," so she chose medication that would not be toxic to her kidneys. Nurse Wise described banded neutrophils and said that the presence of them in Shelly's body showed that she had an infection. Nurse Wise said that the "cutoff" for raising the alarm about a patient's infection level was 10 percent banded neutrophils. Nurse Wise said that she checked Shelly's blood cultures at 24 and 72 hours, and they were negative for sepsis. Nurse Wise said that she would have contacted the women's jail if Shelly's cultures showed signs of sepsis.

She prescribed Shelly Clindamycin and Bactrim. Nurse Wise said that in her experience treating inmates, she knew that prisons often kept stock of certain antibiotics, so that inmates could start them on the medicine until their prescriptions were filled. Nurse Wise said she knew that Shelly was going to be released to a place where she had access to medicine and medical care. Her discharge instructions stated that Shelly's wound was to be changed daily.

Nurse Wise agreed that Shelly's BUN, creatinine, GFR, and $CO_2$ levels were abnormal. She agreed that Shelly's GFR of 40 was consistent with stage three chronic kidney disease. She agreed that Shelly's protein and albumin were low. Nurse Wise acknowledged that she did not know Shelly's baseline levels for any of those items. Nurse Wise agreed that

18

several of Shelly's CBC levels showed that she was anemic. Nurse Wise said that Shelly did not meet the criteria for admission, so she was discharged. Nurse Wise said that she disagreed with the medical review panel's opinion, but she acknowledged that she had not read Shelly's death certificate, autopsy report, or detention center records. Nurse Wise said that two blood cultures were taken from Shelly and they did not show growth after one day, two days, or five days; she said that if Shelly was septic, she would have expected to see some growth within those periods.

Dr. Hearn was accepted as an expert in the field of general practice, and the court noted her expertise in the treatment of prisoners in correctional facilities. Dr. Hearn testified that she worked as the Medical Director of David Wade Correctional Center in 2012. She also provided medical services to the Claiborne Parish Detention Center. She said that she saw inmates there on her way home from David Wade. When she saw female inmates, they were brought from the women's jail to the Claiborne detention facility. The women's jail had a full-time nurse and nurse's aide. Dr. Hearn said that she did not hire, train, or supervise the nurses, guards, or staff at the women's jail. Dr. Hearn testified that if inmates had medical complaints, they filled out a form and were seen, and if an inmate had an emergency, "it should be dealt with in that fashion."

Dr. Hearn said that she had seen Shelly before she developed her boil, but she was not involved in her treatment on December 15, 2012, when she went to CMMC. She said that the only contact she had with the women's jail about Shelly was on December 19, 2012. Dr. Hearn said that the only documentation the prison facility had from CMMC about Shelly's condition

19

was the one-page discharge sheet which said that she was prescribed two antibiotics. When she spoke with Nurse Edwards about Shelly, Dr. Hearn thought that Shelly's nausea came from the Bactrim, so she told Nurse Edwards to discontinue the Bactrim and give her doxycycline instead. Dr. Hearn questioned Nurse Edwards about Shelly's wound and her condition. Nurse Edwards told her that her wound did not look worse and the redness was not spreading; she told the doctor that Shelly did not have a fever and that she was "stable."

Dr. Hearn said that she "did not hear an urgency" in her call with Nurse Edwards and that she told the nurse to let her know if Shelly did not get better or respond to treatment. Dr. Hearn testified that Nurse Edwards' notes about Shelly showed that things were progressing in a positive fashion. She said that she spoke with Nurse Edwards on December 21, 2012, when she reported that Shelly was in distress and wanted a B12 shot. Dr. Hearn told Nurse Edwards to check on Shelly and said that, if she was in distress, she needed to go to the hospital.

Dr. Hearn identified the pills that were found with Shelly's possessions. She said that there were (1) two Cleocin tablets, an antibiotic, (2) nine Celexa tablets, an antidepressant, (3) some Tylenol, (4) Mobic, an NSAID, (5) some Prilosec, and (6) a package of Cholestyramine. Dr. Hearn said that Shelly's toxicology report showed that she had amitriptyline in her system, even though she was not prescribed that drug, and she had six times the normal amount of Citalopram and four times the normal amount of Benadryl in her system.

Dr. Hearn said she disagreed with Dr. Peretti's conclusion about Shelly's cause of death, but she acknowledged that she never practiced in the field of pathology. She said that Shelly had medications in her system that could have altered her heart rhythm. Dr. Hearn said that the qSOFA score that Dr. Sidi referenced was the result of a sepsis study that occurred in 2016. Dr. Hearn said that it was the responsibility of the jail nurse to deliver medication to the patients, and she did not believe that Nurse Edwards breached the standard of care.

Dr. Alan Jones ("Dr. Jones") testified that he was a professor in the department of emergency medicine and the Associate Vice Chancellor for Health Affairs at University of Mississippi Medical Center. He stated that he was board certified in emergency medicine and had a particular focus in the diagnosis and management of sepsis, having authored more than 200 academic papers on the topic. Dr. Jones said that he was not aware of the standard of care that applies to general practitioners in Claiborne Parish and that he was not board certified in internal medicine or practiced in that area. He also affirmed that he had never provided treatment to inmates and he was not licensed to practice medicine in Louisiana. Dr. Jones commented that he had not done a residency in sepsis and he was not board certified in that area because no such board certification existed.

Plaintiffs objected to tendering Dr. Jones as an expert in the field of internal medicine and sepsis, arguing that sepsis was not a recognized field of expertise. Plaintiffs argued that Dr. Jones should not have offered an opinion about a breach of the standard of care for Dr. Hearn because she was general practitioner, a field in which the locality standard applied. Plaintiffs

21

pointed out that Dr. Jones said he was not aware of the standard of care that applied in Claiborne Parish. The trial court denied the objection about Dr. Jones testifying as a sepsis expert. Defendants withdrew their submission of Dr. Jones as an expert in the field of internal medicine. Defendants argued that Dr. Jones said he worked in a transfer facility that treats patients in smaller, rural areas, like Claiborne Parish; the trial court agreed, saying he met the standard required by the locality rule.

Dr. Jones testified that sepsis was an abnormal immune response to an infection that resulted in life-threatening organ failure. Dr. Jones stated that he led clinical trials on sepsis and, as an ER doctor, would have seen more cases of sepsis than Dr. Sidi, an infectious disease doctor. Dr. Jones testified that Shelly was not septic. He stated that Shelly had an infection when she was at the ER on December 15, 2012, but her blood test results showed that the infection had not entered her bloodstream. He said that 70 percent of patients with sepsis had a positive blood culture for sepsis. Dr. Jones said that it was more likely that Shelly's infection was local to her abscess and had not spread throughout her body.

Dr. Jones testified that hemoglobin and albumin levels were not indicators of acute illness, but instead, those lab values showed a patient's diet and nutrition status or that a patient had a gastric bypass procedure, which Shelly had. He said that abnormal BUN and creatinine levels marked kidney dysfunction and/or dehydration. He also said that the presence of banded neutrophils was not necessarily a sign of sepsis and that a level of four percent banded neutrophils was very low and a normal marker of infection.

22

Dr. Jones said that Shelly's clinical, laboratory, or physiological parameters from her December 15, 2012, visit to the ER did not show that she needed inpatient treatment. He testified that the IV antibiotic that Shelly received was long-lasting, about 36 hours, and was a broad-spectrum antibiotic, which would have eradicated any bacteria in her bloodstream. Dr. Jones said that Nurse Wise saw that Shelly was alert, oriented, talking, ambulatory, and not lethargic, which were factors in diagnosing a patient with sepsis. He stated that he thought that Nurse Wise's care was reasonable and not a deviation from the standard of care.

Dr. Jones testified that untreated sepsis resulted in a gradual decline, over a series of days, in a patient's organs, leading to cardiovascular collapse. He stated that such a decline resulted in progressive lethargy, confusion, and an altered mental status. Dr. Jones said that those signs were not present in Shelly's case. Defense counsel asked Dr. Jones about Dr. Hearn changing Shelly's antibiotic on December 19, 2012, to which plaintiffs objected because Dr. Jones stated that he was not familiar with the locality standard in Claiborne Parish. Dr. Jones testified that a physician would offer the appropriate antibiotic based upon the predominant strains of bacteria causing infections in a community, which would be the same treatment given by any physician whether she worked in an office, ER, or prison setting. The trial court overruled the objection.

Dr. Jones said that Dr. Hearn changing Shelly's antibiotic from Bactrim to doxycycline was not a breach of the standard of care and was a reasonable response to Shelly's complaint of nausea. Dr. Jones said that doxycycline does not normally cause nausea or gastric distress. He said that

23

Dr. Hearn's order on December 21, 2012, that prison staff continue to monitor Shelly after the physician was told that she had difficulty breathing, but was coherent and showed no signs of respiratory distress, was appropriate. Dr. Jones pointed to Nurse Edwards' note that Shelly appeared normal when she saw her on the morning of December 21, 2012.

Dr. Jones said that Shelly's infection did not reach below the fascia or muscular layers of her body. He also testified that the inflammation in Shelly's spleen was not necessarily an indicator of sepsis but could be seen in multiple conditions. He said that any infection causes inflammation. Dr. Jones stated that Shelly's broken bones and head were unexplained traumatic injuries and her toxicology results showed the presence of drugs in her system that could cause abnormal heart rhythms, which he said could have provided an alternative explanation for her death.

Dr. Jones testified that he did not compare any of Shelly's jail or CMMC medical records with those from the Green Clinic, where she was a patient before she was incarcerated. He acknowledged that a negative blood culture does not completely rule out sepsis, as 50-60 percent of patients were negative for bacteria in their blood but did have sepsis. He stated that Nurse Edwards did not document Shelly's vital signs on any of her notes, so he could not say whether Shelly's vitals were within normal ranges at those times. Dr. Jones agreed that from December 18-21, 2012, Nurse Edwards documented that Shelly said she could not eat or drink, and that on December 21, 2012, when Nurse Edwards changed Shelly's dressing, she complained that she was sick to her stomach and did not feel like getting up. Dr. Jones concurred that Shelly's rib fractures were consistent with injuries

24

from CPR, her spinal fracture did not show injury to her spinal cord, and her head injury did not injure her skull or brain.

On June 23, 2025, the trial court signed a judgment in favor of CMMC, Nurse Wise, and Dr. Hearn, dismissing plaintiffs' claims with prejudice. In its written reasons for judgment, the trial court first stated:

> Shelly Grafton pled guilty to numerous counts of theft and one count of forgery on August 28, 2012, and was sentenced to ten years on each count, with each sentence to run concurrently. During her incarceration, Grafton was housed at Claiborne Parish Women's Jail ("CPWJ") during her pre-trial detainment. After her plea and sentencing, the Third Judicial District Court recommended to the Louisiana Department of Public Safety and Corrections that Grafton remained housed at CPWJ.

The trial court found Dr. Jones to be "by far" the most-qualified medical witness about sepsis, stating that his testimony was the most "correct and accurate." The trial court said that Dr. Peretti's determination of Shelly's cause of death was "inaccurate," and the medical review panel failed to consider Dr. Hearn's employment responsibilities. The trial court said that plaintiffs failed to meet their burden of proving that defendants' treatment of Shelly fell below the applicable standard of care or denied her a chance of survival.

The trial court noted that Dr. Jones said he would have provided the same care to Shelly as Nurse Wise did. The court said that Dr. Jones was a "world-renowned expert in the diagnosis and treatment of sepsis" and accepted his conclusion that Shelly was not septic when she was at CMMC on December 15, 2012, and did not thereafter die of sepsis on December 21, 2012. The trial court also said that it accepted that Nurse Wise's treatment of Shelly was medically appropriate, and Dr. Hearn was not medically

negligent in the medical advice she gave via telephone to the parish detention center on December 19 and 21, 2012. Plaintiffs appeal.

**DISCUSSION**

*Standard of Review*

The manifest error standard applies to the review of medical malpractice cases, under which standard of review a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. *Benefield v. Sibley*, 43,317 (La. App. 2 Cir. 7/9/08), 988 So. 2d 279, *writs denied*, 08-2162, 08-2210, 08-2247 (La. 11/21/08), 996 So. 2d 1107.

To reverse a fact finder's determination, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *Stobart v. State Through DOTD,* 617 So. 2d 880 (La. 1993).

The appellate court must not reweigh the evidence or substitute its own factual finding because it would have decided the case differently. *Pinsonneault v. Merchants & Farmers Bank & Tr. Co.*, 01-2217 (La. 4/3/02), 816 So. 2d 270. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. *Stobart v. State Through DOTD, supra*; *Hays v. Christus Schumpert N. La.*, 46,408 (La. App. 2 Cir. 9/21/11), 72 So. 3d 955. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or plainly

26

wrong. *Stobart v. State Through DOTD, supra*; *McBride v. Rafael Lara Constr., LLC*, 56,440 (La. App. 2 Cir. 10/22/25), 423 So. 3d 631.

*Trial Court Bias*

First, appellants argue that the trial court erred by engaging in an independent investigation into matters outside the record and then based its ruling, in part, on that information. Specifically, appellants complain that the trial court provided Shelly's criminal history. Appellants contend that the trial court's inclusion of that information, which they allege was not in the record, influenced the court in such a way that demonstrated bias in its judgment. Appellants state that their due process rights were violated when the trial court considered evidence not in the record and argue that the trial court's error entitles them to *de novo* review.

A finder of fact cannot consider evidence outside the record in making its findings. *State ex rel. D.R.*, 10-0404 (La. App. 4 Cir. 11/10/10), 51 So. 3d 844, *writs denied*, 10-2711, 11-0264 (La. 5/27/11), 63 So. 3d 996.

The trial court's inclusion of Shelly's criminal history and sentence was not relevant to the resolution of plaintiffs' medical malpractice claims. However, it was relevant that Shelly was incarcerated when the events giving rise to the claims occurred. It does appear that at least some of that information about her crimes and sentences was included in the record, but that information was not material to the determination of the claims. This court finds that any error made by the court in including Shelly's criminal history in its reasons for judgment is harmless as the court's conclusion was supported by the evidence and is legally correct. As such, the manifest error

27

standard of review applies to appellants' claims and this assignment of error is meritless.

*Qualification of Dr. Jones as a Sepsis Expert*

In their second assignment of error, appellants contend that the trial court erred by qualifying Dr. Jones as an expert in sepsis, when no such specialized field exists.

The trial court has broad discretion in determining whether expert testimony should be admissible and who should be permitted to testify as an expert. *Cheairs v. State*, 03-0680 (La. 12/3/03), 861 So. 2d 536; *Hall v. Bennett*, 54,995 (La. App. 2 Cir. 4/5/23), 361 So. 3d 1090. The decision to admit or exclude expert testimony is reviewed for abuse of discretion. *Id*.

In determining whether a witness is qualified based upon training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness is board certified or has other substantial training or experience in an area of medical practice relevant to the claim and is actively practicing in that area. La. R.S. 9:2794(D)(3). A specialist's knowledge of the requisite subject matter, rather than the specialty he practices, determines whether a specialist may testify as to the applicable degree of care in a particular case. *Staten v. Glenwood Reg'l Med. Ctr.*, 53,220 (La. App. 2 Cir. 1/29/20), 290 So. 3d 280, *writ denied*, 20-00591 (La. 9/23/20), 301 So. 3d 1184.

The trial court did not err in allowing Dr. Jones to testify as a specialist with expert knowledge of sepsis. Dr. Jones' C.V. was admitted and shows that he is a world-renowned expert on sepsis by Expertscape, a ranking which assesses the bearing a researcher has in a specific field. Dr.

28

Jones was listed in the top .05 percent of physicians in the field of sepsis. Dr. Jones also holds patents for markers of sepsis treatment, and he is a member of the American College of Emergency Physicians Sepsis Taskforce. He has published around 200 journal articles on sepsis and authored chapters on sepsis in two textbooks on emergency medicine. We find that the trial court did not abuse its discretion in allowing Dr. Jones to testify as an expert on sepsis, and this assignment of error lacks merit.

*Dr. Jones' Testimony About the Applicable Standard of Care*

Appellants' third assignment of error claims that the trial court abused its discretion by allowing Dr. Jones to testify about the standard of care applicable to Dr. Hearn and Nurse Wise despite his "judicial confession" that he was not qualified to render an opinion about the standard of care for a general practitioner in Claiborne Parish.

In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 *et seq*., the plaintiff shall have the burden of proving the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances. La. R.S. 9:2794(A)(1).

The locality rule, as detailed above, requires that the degree of care to which a physician is to be held be based solely upon the standard of practice in a similar community or locale and under similar circumstances, and it applies solely to non-specialists. *Berthelot v. Stalder*, 12-1758 (La. App. 1 Cir. 7/29/13), *writ denied*, 13-2290 (La. 1/10/14), 132 So. 3d 1249.

29

Specialists are held to a national standard, that degree of care ordinarily practiced by physicians within the involved medical specialty. *Id.*

Under La. R.S. 9:2794, an expert must possess the requisite knowledge about the applicable standard of care. A specialist may testify as an expert witness in a case involving a general practitioner if he has sufficient knowledge of the requisite subject matter. *McLean v. Hunter,* 495 So. 2d 1298 (La. 1986); *Staten v. Glenwood Reg'l Med. Ctr., supra.* However, the expert must also be familiar with the standard required of a physician under similar circumstances in a similar community. *Rowsey v. Jones,* 26,823 (La. App. 2 Cir. 5/10/95), 655 So. 2d 560.

The only jurisprudential exception to the locality rule eliminating the "similar community" requirement is where a uniform nationwide method for a particular medical procedure has been established. *Leyva v. Iberia Gen. Hosp.,* 94-0795 (La. 10/17/94), 643 So. 2d 1236. Absent this exception, an expert must be familiar with the degree of care ordinarily exercised by physicians in a similar community or locale and under similar circumstances. *Rowsey v. Jones, supra.*

Nurses who perform medical services are subject to the same standards of care and liability as are physician in a similar community or locality and under similar circumstances. *Benefield v. Sibley, supra.*

While Dr. Jones initially stated that he could not provide the standard of care for a general practitioner in Dr. Hearn's locality, he then discussed his experience in relying upon the judgment and reporting of nurses to make diagnostic or treatment decisions without examining the patient himself. He also testified that where he worked, the ER at the University of Mississippi

30

Medical Center, there was an observational unit where admitted patients received prolonged evaluation and treatment. He stated that he often received calls from nurses about patients' new symptoms or problems, but he often would not examine those patients and would instead rely on the nurses' assessment of the patients.

Dr. Jones testified that his medical center also had a referral line, which different facilities, such as other hospitals, nursing homes, and jails, would call for advice about patients' complaints and whether those patients needed to be examined by a physician or be transported to an ER. Dr. Jones affirmed that he had similar experience to Dr. Hearn, in that he often had a rural nurse report his or her findings to him, and he would then make decisions and advise the nurses about further treatment. He stated that to do so was a "normal process" in medicine.

Dr. Jones spent his career in emergency medicine and worked with ER nurses in rendering appropriate treatment for patients he did not examine. We find that he was qualified to testify about the applicable standard of care for Nurse Wise, an ER nurse. We likewise find that he was qualified to render an opinion about the applicable standard of care for Dr. Hearn, a general practitioner, because he worked in a similar fashion, fielding calls from rural hospitals and jails from nurses describing patients' medical complaints and advising them about treatment, all without examining those patients himself. This assignment of error lacks merit.

*La. R.S. 9:2794 and Defendants' Liability*

Appellants' final assignments of error will be considered together. In their fourth assignment of error, appellants claim that the trial court erred by

failing to follow the format required by La. R.S. 9:2794 in evaluating the evidence. Appellants complain that the trial court's written reasons for judgment failed to evaluate whether they proved the applicable standard of care, proved that defendants violated the applicable standard of care, and proved that there was a breach of the standard of care by defendants resulting in loss, injury, or damage to plaintiffs.

In their last two assignments of error, appellants argue that the trial court erred in finding that Nurse Wise/CMMC and Dr. Hearn complied with the applicable standards of care in their medical management of Shelly and holding that their care was not a factor in her death.

To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) the defendant breached that standard of care; and (3) there was a causal connection between the breach and the resulting injury. La. R.S. 9:2794; *Schultz v. Guoth*, 10-0343 (La. 1/19/11), 57 So. 3d 1002. Expert testimony is generally required to establish the applicable standard of care and whether that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. *Id*.

We find that the trial court did not err in its manner of analyzing plaintiffs' medical malpractice claims. Plaintiffs had to prove the standard of care, breach of the standard of care, and a causal connection between the breach and injury suffered. Plaintiffs had to satisfy all three elements to succeed in their suit. If plaintiffs were unable to prove even one element by a preponderance of the evidence, then their medical malpractice claims

failed. The trial court found that plaintiffs failed to establish that any breach of the standard of care caused Shelly's illness or death. Because the trial court denied and dismissed plaintiffs' claims based on causation, it was not required to provide any boilerplate recitation and analysis of the remaining elements found in La. R.S. 9:2794. To do so frustrates judicial economy.

The trial court was presented with conflicting evidence about what caused Shelly's death. Dr. Jones concluded that Shelly did not die of sepsis; his testimony conflicted with Dr. Peretti's and Dr. Sidi's. Dr. Jones also offered alternative reasons for Shelly's lab results, which in his opinion showed Shelly's poor nutritional status and that she was suffering from dehydration, rather than that she was septic. The court was required to reconcile those inconsistencies and found Dr. Jones' testimony more persuasive and credible. This court is not allowed to substitute its evaluations and inferences for that of the trier of fact, and determinations of credibility are not to be disturbed on appeal.

We cannot state that the trial court was manifestly erroneous in finding that (1) Nurse Wise/CMMC and Dr. Hearn did not breach the standard of care; and (2) there was no causal link between their actions and Shelly's death. While the medical review panel found that Dr. Hearn's and Nurse Wise's actions fell below the standard of care required and led to Shelly's death, the panel failed to consider Shelly's CMMC lab results, her toxicology results, and the signs of trauma found during her autopsy.

Nurse Wise testified that it was not necessary to incise Shelly's wound to drain it because it was already open. Therefore, she did not perform any action that might have introduced bacteria into Shelly's

33

bloodstream.  Nurse Wise noted that on December 15, 2012, Shelly's lab results showed that her wound was infected with MRSA, but her blood cultures, checked at one day, two days, and five days, showed that her blood was negative for sepsis.  However, we acknowledge that Dr. Jones testified that about 30-50 percent of septic patients have negative lab results for sepsis.  Nurse Wise said that the cutoff prompting concerns that a patient was septic was 10 percent banded neutrophils, and Shelly's banded neutrophils were at 4 percent.  Dr. Sidi discussed her qSOFA score, a metric, we note, that was not used until 2016; Shelly died in 2012.

Dr. Jones said that the IV Zyvox Shelly received on December 15, 2012, was a broad spectrum antibiotic and would have eradicated any bacteria in her bloodstream.  Nurse Wise noted that Shelly was alert, oriented, talking, and ambulatory when she saw her at CMMC.  Dr. Jones stated that if Shelly had been septic at that time, she would have been lethargic, confused, and shown an altered mental state.

Shelly did not start her course of oral antibiotics until December 18, 2012, and even then, her medication was irregularly administered by the jail.  Dr. Hearn was not Nurse Edwards' supervisor.  Her toxicology results showed that she had Dramamine and antidepressants in her system, but no antibiotics were present at her death.  Dr. Hearn stated that she had several times the normal dose of those medications, which could have caused Shelly to have an abnormal heart rhythm.  Nurse Edwards was the medical professional that saw Shelly regularly, and it was her responsibility and that of the detention facility's staff to monitor Shelly and report to Dr. Hearn what they observed.

Dr. Sidi compared Shelly's CMMC medical records to her 2012 records from the Green Clinic, but Dr. Hearn and Nurse Wise did not have access to those records and did not know Shelly's baseline levels.

Dr. Jones stated that Dr. Hearn's orders on December 19 and 21, 2012, when she told prison staff to continue to monitor Shelly, were appropriate. Dr. Hearn was not informed of Shelly's condition until December 19, 2012, at which time she changed her antibiotic to combat her nausea.

Nurse Edwards did not testify, so the only testimony the trial court heard about what she said to Dr. Hearn about Shelly's condition was Dr. Hearn's testimony. Dr. Hearn stated that there was no sense of urgency when Nurse Edwards communicated with her about Shelly's condition. Nurse Edwards told the doctor that Shelly did not have a fever and that she was stable. Dr. Hearn relied on Nurse Edwards' opinion and told her that if Shelly was in distress, she needed to go to the hospital. Dr. Hearn was told by prison staff on December 21, 2012, that Shelly was having difficulty breathing but was coherent and did not show signs of respiratory distress.

Reports from Shelly's fellow inmates and prison staff, collected during law enforcement's investigation into Shelly's death and admitted as a joint exhibit, showed that the inmates and guards said Shelly was lethargic, feeling ill, and her condition deteriorated in the days before she died. Most of those who provided the reports thought Shelly was faking her symptoms. Joanne also testified that Shelly was too ill to visit with her in the week before her death. That information conflicts with Dr. Jones' testimony that Shelly would have shown signs of lethargy and confusion prior to her death.

35

However, Nurse Wise did not work at the women's jail and did not note those symptoms when she examined Shelly, and there was no evidence presented at trial showing that the full extent of Shelly's condition was reported to Dr. Hearn.

We find that there exists a reasonable factual basis for the trial court's determination that Dr. Hearn and Nurse Wise did not engage in medical malpractice. Also, the record does not support such a finding. The trial court's conclusions are reasonable; there was more than one permissible view of the evidence, and we cannot say that the trial court's choice between them was manifestly erroneous or plainly wrong. Appellant's final assignments of error lack merit.

## CONCLUSION

For the foregoing reasons, the trial court's ruling is affirmed. The costs of the appeal are assessed to appellants.

**AFFIRMED.**

**THOMPSON, J., concurs.**

When individuals lose the ability to supervise their own medical care, those entrusted with that responsibility must undertake every reasonable effort to promptly and effectively provide access to care. The testimony and records contained in the record, as well as the unfortunate outcome, are concerning, particularly regarding administration of prescribed medications necessary to stop the spread of infection. The parties before us, however, are the nurse at the hospital, the hospital, and the contract physician, facing allegations that they are to blame for the tragic outcome which befell Ms. Grafton. It is important to note there was a contemporary parallel proceeding instituted in the United States District Court for the Western District of Louisiana against the detention facility where Miss Grafton was housed, and its administrators and employees/nurse. That matter has been resolved, and those defendants are not before this court. My colleagues are correct in recognizing there was more than one permissible view of the evidence regarding Dr. Hearn and Nurse Wise, and I concur there was a reasonable factual basis for the trial court to determine they did not engage in medical malpractice.